**CHAMPION PARTS REBUILDERS, INC., Plaintiff,**

v.

**CORMIER CORPORATION, et al., Defendants.**

**No. 86 C 8906.**

United States District Court, N.D. Illinois, E.D.

April 9, 1987.

Preliminary Injunction Order May 26, 1987.

As Amended June 1, 1987.

Randall L. Mitchell, Peter V. Baugher, Paul E. Lehner, Phillip Fertik, Adams, Fox,

Adelstein & Rosen, Chicago, Ill., William G. McGuinness, William H. Freilich, Fried, Frank, Harris, Shriver & Jacobson, New York City, for plaintiff.

Richard C. Nelson, Ovide M. Lamontagne, Manchester, N.H., Donald K. Stern, Russell B. Stevenson, Jr., Hale & Dorr, Boston, Mass. and Washington, D.C., John J. Enright, Arvey, Hodes, Costello & Burman, Stephen J. Landes, Holleb & Coff, Ltd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Champion Parts Rebuilders, Inc. ("Champion") seeks a preliminary injunction against a large number of defendants:

1. "Cormier Defendants," comprising Odilon Cormier ("Cormier"), his company Cormier Corporation, Claude, Monique, Daniel, Nicole and Pierre Cormier and Suzanne Arena;

2. "Navon Defendants," comprising Morris Navon ("Morris"), his brother Herman ("Herman") and Blanche, Samuel, Valerie, Renee, Ruben and Stephanie Navon;

3. Rieger, Robinson, Harrington & Co., Inc. ("RRH"); and

4. Scott Hodes ("Hodes");

all stemming from claimed violations of Securities Exchange Act of 1934 ("1934 Act") § 13(d), 15 U.S.C. § 78m(d) and 1934 Act § 14(a), 15 U.S.C. § 78n(a). After extensive accelerated discovery by the litigants, this Court conducted an evidentiary hearing (the "Hearing"), and the still-active litigants [1] submitted post-Hearing findings of fact with supporting legal memoranda. In conformity with Fed.R.Civ.P. ("Rule") 52(a), what follows are this Court's findings of fact ("Findings") and conclusions of law ("Conclusions").[2]

### Findings of Fact [3]

#### A. Parties and General Background

1. Champion is an Illinois corporation with its principal place of business in Oak Brook, Illinois.[4] In addition to its headquarters in Oak Brook, Champion operates four main plants located in various parts of the country and employs some 2400 persons nationwide. It is the largest domestic independent remanufacturer of products for the automobile, truck and farm equip-

---

1. Just before the Hearing, RRH settled with Champion by agreeing to certain restrictions on the voting and sale of its Champion shares for a four-year period, and RRH was then dismissed as a defendant. RRH's letter agreement with Champion, reflecting the terms of the settlement, was admitted into evidence as part of DX 7.

2. To the extent (if any) these Findings may be deemed conclusions of law, they shall also be considered Conclusions. To the extent (if any) matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings.

3. Although the Conclusions will make this point with appropriate citations, it is important to stress at the outset that these are not ultimate determinations of fact—rather the determinations are based on the record at the Hearing, tested against Champion's burden (not an unduly heavy one under the cases) to show a reasonable likelihood of success on the merits. In particular, all the facts necessary for ultimate credibility determinations may not have been furnished this Court at the Hearing. Nonetheless, the resolution of credibility matters re-

flected in the Findings does stem from strong impressions created by the nature of all the evidence taken as a whole. To some extremely wealthy investors, substantial six-figure or even seven-figure purchases in a little-known (though publicly-held) stock may perhaps represent every-day independent business judgments. But it frankly strains credulity to observe a handful of individuals such as Cormier and the others discussed in the Findings, who had recently been active in a common investment with a common goal, now working primarily through a single brokerage firm and plunging with such substantial resources into still another stock deal such as Champion—then asserting (a) no *agreement* had been at work among them and (b) Cormier and his broker were totally surprised, in adding up the numbers on the way to a previously-arranged and crucial meeting with management, to find they had enough control to demand majority representation on Champion's Board of Directors.

4. As a corporation organized under the 1870 Illinois Constitution, Champion must elect its directors by cumulative voting, absent unanimous agreement by its shareholders.

ment aftermarket, with 1986 sales of approximately $110 million (Schwartz Tr.).[5]

2. In exchange for each rebuilt automotive part sold by Champion, it is obligated to take back, and issue a credit for, an old part (the "core"). Cores are the raw material for Champion's rebuilt products. Champion's customers, in turn, rely on prompt identification and receipt of credit for the returned cores and prompt delivery of the rebuilt product. Champion thus depends on its reputation for reliability and consistency of supply. Its market is competitive and profit margins are narrow (Schwartz Tr.; PX 27, 28).

3. Sales to original equipment manufacturers are Champion's most important emerging business development (Schwartz Tr.). In 1986 Champion netted $5 million in sales to Chrysler Corporation ("Chrysler") alone (Savini Tr.). Chrysler is the customer with the greatest potential for Champion (Schwartz Tr.; Savini Tr.). Through sales to Chrysler and other original equipment manufacturers, Champion obtains access to valuable technical information, including parts specifications and manufacturing processes, and receives back into inventory the cores from warranty repairs, which provide a valuable supply of late model parts (Schwartz Tr.).

4. Champion has approximately 2.4 million common shares issued and outstanding (1.9 million before a September 18, 1986 5–for–4 stock split). Its shares are registered with the SEC pursuant to 1934 Act § 12(g). They have been and are publicly traded as a NASDAQ National Market Issue in the over-the-counter market under the identifying symbol "CREB" (Schwartz Tr.).

5. Before June 1986 Champion's shares were widely held, with the exception of two significant blocks: one (approximately 16% of the outstanding shares) held by the Bass family interests, and the other (approximately 18% of the outstanding shares) held by the Gross family interests. Schwartz held, and still holds, approximately 4% of the outstanding shares (107,000 shares)

(Schwartz Tr.). Trading in Champion's shares was orderly, with relatively constant volume and small price fluctuations. Trading volume was in the hundreds or thousands of shares per day and the bid-asked spread was narrow, reflecting an active or liquid market (Schwartz Tr.).

6. Cormier Corporation is a New Hampshire corporation engaged in the manufacture of textile products, with its principal place of business in Laconia, New Hampshire. Cormier is its chief executive officer and the principal owner of it and other corporations. Cormier Defendants also comprise Claude, Monique, Daniel, Nicole and Pierre Cormier and Suzanne Arena, all members of Cormier's family residing in New Hampshire (Cormier Tr.).

7. Navon Defendants comprise Morris, Herman, Blanche, Samuel, Valerie, Renee, Ruben and Stephanie Navon, all members of the same family residing in New York (M. Navon Tr.).

8. RRH, a Delaware corporation with its principal place of business located in New York, is a registered investment advisor. Jackson Robinson ("Robinson") is President of RRH (PX 6).

9. Hodes is a partner in the Chicago law firm of Arvey Hodes, Costello & Burman and resides in Chicago, Illinois. Hodes concentrates his legal practice in corporate and federal securities law (Hodes Tr.).

### B. *Pre-Existing Relationships*

10. All activities of Cormier Defendants, Navon Defendants and RRH looking toward their acting in concert in connection with Champion, and ultimately in Cormier's asserting control over Champion, were coordinated by two brokers at Oppenheimer & Co., Inc. ("Oppenheimer")—Daniel O'Neil ("O'Neil") and Peter ("Tony") Russ ("Russ")—operating literally from a single office at Oppenheimer in New York City. O'Neil was the broker for Cormier, Herman Navon and RRH and their numerous customers in whose accounts he placed

---

5. Hearing testimony is cited "[Name of witness] Tr." Deposition testimony is cited by its page: "[Name of witness]—." Champion's exhibits are cited "PX—." Defendants' exhibits are cited "DX—" (all were introduced by the Cormier-Navon Defendants; Hodes introduced no exhibits).

Champion stock during the summer of 1986 and whose "support" was later claimed by Cormier when he, acting for the group, demanded control of Champion. Russ was also the broker for Hodes and Sheldon Gray ("Gray"). It was O'Neil and Russ—and other Oppenheimer brokers—who initially targeted Champion as a takeover candidate. Through their broker-agents, Cormier Defendants, Navon Defendants and RRH thereupon set their sights upon acquiring substantial shareholdings in Champion.

11. This was not the first instance in which the same parties had invested and acted together in a corporate control contest. Only a few months earlier in 1986 Cormier, Morris and Herman, a number of O'Neil's clients, some of Cormier's friends and associates, some of the Navons' friends and associates and RRH were all shareholders in United Federal Savings Bank of Manchester, New Hampshire, and joined in opposing a merger of that bank with another institution (Robinson 9–14; M. Navon Tr.).[6] Cormier and Robinson, just as they later agreed to do (and did) with respect to Champion, split the legal fees and other expenses incurred in opposing the merger (Cormier Tr.). On the night before the shareholders' meeting at the end of May 1986, Cormier, Robinson, O'Neil (and, according to Robinson, Morris) met in Manchester to coordinate their strategy for the meeting (Cormier Tr.; Robinson 16–19, 25–31). Next day the merger was approved over their opposition, but they resolved never again to enter such a contest without first having "all the chips on [their] side of the table" (a clear reference to having lined up all their votes) (Gray 136–37), thus setting the stage for their present foray.

C. *Initial Oppenheimer Interest in Champion*

12. Early in May 1986 Russ saw Champion appear on a "Metz-Weinger" screen for companies displaying certain financial characteristics (Russ 10). That screen is used by Oppenheimer personnel to identify companies that "are worth a lot more dead than alive"—companies with "significantly understated values vis-a-vis what they're being carried on the books for versus what they might be sold" (Russ 79–80). As Gray perceived it, such companies' asset liquidation or breakup values are greater than their values as operating companies (Gray 41).

13. After Champion appeared on the "better dead than alive" screen, Russ began to discuss Champion with O'Neil (with whom he shared an office and a secretary), David Rosin ("Rosin," another Oppenheimer broker), Michael Metz ("Metz," an Oppenheimer Senior Vice President) and then Whitney George ("George," another Oppenheimer broker). Russ told O'Neil, Metz, George and Rosin he had a prior relationship with Champion and was familiar with the company (Russ 10–11; O'Neil 18–19).

14. Russ and O'Neil discussed Champion's supposedly substantial real estate holdings and other "hidden" asset values (O'Neil 18–24, 37–38). They were particularly interested in determining the liquidation value of Champion's real estate (O'Neil 22). Russ went to see Metz in early May and brought Metz the public information he had assembled (Russ 10–11, 39, 88; Metz 11–12). Metz concluded one of the "primary reasons" Champion was so "cheap" was that it "had an unusually high amount of real estate ... a lot of which looked like it was not necessary for use in the business" (Metz 12). About the time of those conversations, Metz made informal appraisals of the real estate and determined the probable breakup value of Champion (PX 14). Russ and Metz concluded *"that if all of the real estate were sold and all of the other assets were liquidated, we would realize at least $19 per share"* (Russ 79–80, emphasis added; PX 14). Russ reported the breakup analysis

6. During the course of the efforts in connection with the New Hampshire bank, Robinson wrote the chairman of that bank demanding a shareholders' meeting (PX 47). Russ (who presumably obtained the letter from O'Neil and Robinson) later sent a copy of that letter to Hodes as an example of such a demand, to be used in connection with Champion (Hodes Tr.; PX 47).

conclusions to his office-mate O'Neil (Russ 11).

15. Russ and O'Neil began to form a plan to capitalize on the value of Champion's assets. When asked how the "hidden asset" value of the company's real estate could be realized, Russ said, "You sell it" (Russ 41). In like manner, Russ said of all aspects of "hidden asset values," "If they were to be realized they would have to be sold" (Russ 75).

### D. *Initial Oppenheimer Solicitations*

16. Russ and O'Neil were talking constantly about Champion, including its liquidation value, during May (O'Neil 21; Russ 89–90). As Russ and O'Neil began to solicit their accounts (Russ 24–27; O'Neil 37), and throughout the period from May through November 1986, each was aware of the other's activities (Russ 70; O'Neil 71). O'Neil necessarily knew of Russ's purchases for and work with Hodes, Gray and Barry Silverstein ("Silverstein"), and Russ necessarily knew of the purchases through O'Neil by Cormier, Herman and RRH (Russ 68–71).

17. Asset value, breakup value and other fundamental changes in the structure of Champion and its business became the keystone of Russ's and O'Neil's solicitations to their clients. Russ and O'Neil told their clients (a) Champion was an "undervalued security with excess real estate" and inventory, (b) Bass Brothers—known takeover speculators—owned 16% of Champion[7] and (c) it is "active investors who often do things to realize what you believe are the undervaluations of the company" (O'Neil 58–59; Metz 22–23).[8]

18. Russ prepared a memorandum in May for Silverstein (who later sold his Champion shares). Russ' memorandum said in part that after "investigation" and "several more conversations with Mike Metz" (PX 14):

(1) Metz firmly believes that the total asset value is at least $19.00 after all debt reduction. He has had several informal appraisals of the real estate, and has confidence in his numbers.

(2) The more I think about this situation, there is only one price to pay, were I going to propose a leveraged buyout. The price $11.50 per share. . . .

(3) If in fact there are $19.00 per share of assets, the net purchase price could be $4.00, because I am convinced that upon consummation of a transaction, sales of excess real estate assets could generate $7.50 per share, thereby reducing the net cost by the same amount.

Russ sent a copy of that memorandum to Hodes and Gray (Hodes Tr.; Hodes 121; Gray 77), and there is every reason to believe its contents and the approach it reflected (if not the memorandum itself) were also communicated to Cormier, Robinson and one or both of Herman and Morris Navon. Thus the thrust of the Oppenheimer solicitation efforts was to induce clients, including all the defendants here, to participate in the plan to take control of Champion and profit, ultimately through the sale of Champion or its principal assets, in the "hidden asset values."

### E. *Involvement of Defendants (Other Than Hodes) Through Their Agents*

19. In early May Metz began to purchase Champion shares for the investment partnership he controls (Metz 5). By the end of June Metz controlled approximately

---

7. Bass Brothers sold their position to Oppenheimer in late June 1986—as Russ knew (Russ 128–29)—just when Oppenheimer brokers began selling shares to Cormier, Herman and RRH (Schwartz Tr.; PX 29). Oppenheimer brokers also continued parking shares at the same time in other of their clients' accounts. Russ told Gray about Bass Brothers' position being sold at the time he was soliciting Gray in June (Gray 25–26).

8. All this evidence clearly creates the implication, and this Court infers, the "active investors" expected by Russ and O'Neil to replace the Bass Brothers in realizing the undervalued assets would be Cormier, RRH and others, all coordinated by the Oppenheimer brokers. Those investors would be "active" by achieving a position in Champion's stock that would enable them to direct its affairs so that they could realize on the asset values Oppenheimer and those investors perceived.

55,900 of the then-outstanding shares[9] (Metz 53, 55–58; PX 26). O'Neil and Russ told other Oppenheimer brokers about Champion, and they too began to purchase Champion shares for their customers.

20. By late June Metz (purchasing for his investment partnership) and various Oppenheimer clients (other than defendants) had acquired over 4.3% of Champion's outstanding shares. Those shares were later included by O'Neil and Cormier as part of the 42% of Champion shares that they controlled when they demanded that the entire Champion Board resign[10] (O'Neil 183–84; Cormier Tr.; PX 26). Those shares have never been disclosed in any Schedule 13D.[11]

21. During May and June, Metz and Russ also entered into an agreement to buy all available shares of Champion "side-by-side": that is, as large blocks became available they would effectively be jointly purchased and "allocated" by Russ and Metz (and later O'Neil) (Russ 37; PX 13). That plan was intended to avoid competition (O'Neil 79) and to gather shares "without overly disrupting the market" and causing the price to "appreciate precipitously" (Russ 68; George 65). Russ and Metz (and then O'Neil) thus sought to avoid alerting the marketplace to the fact they were accumulating and parking large amounts of shares in anticipation of a hoped-for takeover.

22. When O'Neil joined that side-by-side coordinated buying arrangement as to shares he was buying for his clients (principally Cormier, Herman and RRH) (O'Neil 53; PX 13), the Oppenheimer joint purchases were thus split in thirds (O'Neil 79). Once Russ and O'Neil received their portion of the available shares, they further distributed those shares on a wholly discretionary basis among their own customers, principally Cormier, RRH and the various customers O'Neil and Russ would later claim "supported" the takeover[12] (O'Neil 52; Russ 37).

### F. *Cormier's Undisclosed Material Plans for Champion*

23. From the very outset the Oppenheimer goal in taking a major position in Champion, and in seeking to interest its clients in doing so, has been to implement a radical restructuring of Champion by acquiring control, instituting major changes (not simply shifting its everyday business policies), then selling the company in 18–24 months (PX 5 at 18; PX 59, Int. Ans. 11).

24. O'Neil was an active mover in pursuing the goal referred to in Finding 23. In June he telephoned Cormier to report he had a company Cormier would be interested in and as to which he would be sending Cormier information[13] (O'Neil 44–45; Cormier 36–39). O'Neil outlined the four points O'Neil discussed with *all* his clients as part of his set sales pitch on Champion (O'Neil 37–38):

(a) Champion's shares were selling below the book value of the assets.

9. After the September 18 stock split Metz controlled 69,875 shares (PX 26).

10. Metz had complete discretion over the shares purchased for his investment partnership (Metz 5). Various Oppenheimer clients (mainly clients of Russ and O'Neil)—the same clients who sent letters to Champion in November stating their support for the Cormier-Navon-RRH group—owned an additional 27,950 Champion shares (PX 26). O'Neil's conduct in counting those shares among Cormier's "working control" of Champion, before he had even asked for the letters of support, evidences the practical voting and investment discretion O'Neil and Russ had over those shares.

11. No Oppenheimer personnel are defendants here, so the only relief potentially available against them would have to depend on their possible inclusion under Rule 65(d) as "persons in active concert or participation with" defendants. These Findings have not treated the owners of those shares as part of the "group" triggering a Schedule 13D filing obligation.

12. That same joint buying and allocation pattern was repeated when Gray's shares were sold in November. Oppenheimer bought Gray's shares, then Russ and O'Neil "found buyers" for the shares (O'Neil 207–08; Russ 183–84).

13. O'Neil is Cormier's broker and financial advisor. Cormier talks to O'Neil on almost a daily basis, even at night. Cormier does far more than simply place orders with O'Neil: He relies on O'Neil for advice and counsel about potential investments, and O'Neil keeps Cormier abreast of developments in the marketplace (Cormier Tr.).

(b) Its real estate was "undervalued."

(c) Its inventory was "overinflated."

(d) Its marketing base needed to be broadened.

(Cormier Tr.; Cormier 39–43).

25. O'Neil and Cormier discussed the points referred to in Finding 24 at length in mid-June (Cormier 39–43). Cormier testified those were the four items—items whose implementation (including, importantly, the sale of Champion's real estate) was premised on a change of control at Champion—O'Neil said ought to be "given some attention and evaluated" by "outside people" (Cormier Tr.; Cormier 52–53). Cormier confirmed the purpose was not to improve the operating performance of Champion, but rather simply to increase the "book value" of the shares as a first step toward the ultimate sale of Champion in 18–24 months (Cormier 52, 98).[14]

26. From the very inception of Cormier's interest in Champion, evinced by his purchase of stock and his encouragement of relatives and friends to buy stock, Cormier had—and intended to accomplish if he could get into a position to do so—the purposes referred to in Findings 24 and 25. As time went on Cormier developed some of his own refinements in that thinking (such as the possible creation of master limited partnerships to acquire certain Champion assets, and the possible factoring of Champion's receivables), but those variants do *not* —as defendants suggest—reflect an absence of definitive planning, such as to excuse the disclosure of the organic changes Cormier proposed. Nor of course did Cormier's inability to implement those changes until he owned, controlled or

could enlist the support of more shares excuse such disclosure. Finally the obligation to make such disclosure is (again of course) unaffected by the matters stated in Cormier-Navon Defendants Proposed Finding 1:

Prior to [Cormier's] acquisitions of Champion stock, he has never purchased sufficient shares in a public company to be required to file a Schedule 13D. He has never been a director of a publicly-held corporation, nor has he ever been involved in attempting a "takeover" of a publicly-traded company.

Thus the initial Schedule 13D Cormier was required to file (as soon as he, or a group of which he was a member, owned or controlled over 5% of Champion's stock) should have disclosed Cormier's plans for change.

27. In essence the plans Cormier proposed from the very beginning (except for such variants as are mentioned in Finding 26) were the same—premised on the takeover and leading to the ultimate sale of Champion—as Cormier revealed, for the first time, to Champion on October 23 when he demanded its whole Board resign (Cormier Tr.). Some time after the June 1986 discussions with Cormier, Russ and O'Neil had confirmed the takeover plan in a memorandum entitled "Management Reorganization & Corporate Strategy" (the "Reorganization Strategy Memo"), which was later sent to Cormier and others (PX 17). Cormier acknowledges the memorandum "expounded on the four items" O'Neil discussed with him in early summer, items that assumed a change of control at Champion (Cormier 77–78).[15] Cormier admits he used the memorandum in developing his

**14.** As Cormier said in his deposition (Cormier 52, emphasis added):

Q. So he did say to you that if the four items were given some attention, it would be reflected in the value of the stock?

A. Not in the value of the stock. In the book value of the stock itself. *That's all he talked about.*

According to Cormier, it was understood that the reason to increase the book value was to sell the company in 18–24 months (*id.* at 83–84, emphasis added):

Q. When is it that you first recalled having seen or heard anything on the subject of possibly selling the company?

A. It was mentioned—it was mentioned beforehand as when the book value was improved which was going to take 18 months or two years that that would be done, that *the company would be sold entirely.*

**15.** Before PX 17 reached final form, an earlier draft (since discarded by Cormier) was circulated to Cormier, and his comments were solicited and incorporated (Cormier 244–45). Another memorandum, also drafted by Russ and also entitled "Management Reorganization and Corporate Strategy," was unearthed in the course of discovery (PX 21). That document contains a detailed plan for the takeover of Champion.

plans for Champion (Cormier Tr.; PX 59, Int. Ans. 11).

28. There was no room for doubt in the Reorganization Strategy Memo as to the intended fundamental changes in store for Champion (PX 17 at 2, emphasis added):

Reorganization:

*The first thing to be accomplished is control of the Board of Directors.* The existing Board should resign in favor of a new Board. The new Board should consist of people who bring the following characteristics and objectives to Champion: ...

*Upon assuming control,* the Board should agree to steering the Company on a course whose objectives are

(1) Clean up the balance sheet

(2) Eliminate excess capacity.

(3) *Sell the Company to the highest bidder withing (sic) two years of taking control.*

In like vein the memorandum concluded (*id.* at 7–8, emphasis added):

If we can structure the Company to follow this path, within two years we should have a company earning 10 to 15% simple return on equity. The ability to be unleveraged with an above average return on equity should enable *the Company to be sold for a significant premium to its current price.*

Yet none of the basic matters described in this and prior Findings—either the intention to gain control and thereafter to sell the company in 18–24 months or the proposed means for doing so—was disclosed in *any* of the defendants' Schedule 13D filings made during the summer and fall of 1986. Instead Cormier did not refer to any such takeover plans in any Schedule 13D until November 25 (PX 5; see also PX 59, Int. Ans. 11).

G. *Formation of a 1934 Act § 13(d) "Group"*

29. For the reasons stated in the following Findings, Cormier Defendants, Navon Defendants and RRH constitute a "group" for purposes of 1934 Act § 13(d). Because that was so and because all shared the intentions and goals for Champion already discussed in detail, (a) a Schedule 13D should have been filed as soon as their Champion holdings aggregated more than 5% of its outstanding shares and (b) that Schedule should have disclosed those intentions and goals.

30. O'Neil also told another client, RRH President Robinson, Champion was selling below book value and had "hidden assets" in the form of "undervalued" real estate (O'Neil 37–38).[16] In mid-June RRH began to acquire a significant position in Champion. By the end of June RRH had purchased 77,500 of Champion's then outstanding shares. RRH, as an O'Neil client, participated in the allocation scheme whereby the shares acquired by Oppenheimer were being quietly allocated among the group members to avoid alerting the market that a takeover was afoot. O'Neil's accounts with both Robinson and Cormier were discretionary (Gray 151–52).

31. Cormier acknowledged O'Neil "probably" told him of Robinson's interest in Champion (hardly surprising, given their prior collaboration in the United Federal Savings Bank control contest—see Finding 11) (Cormier 212). O'Neil later told Hodes and Gray "Mr. Robinson controlled Mr. Cormier" (see Finding 64) (Gray 133). Though this Court does not so find (Cormier did not appear during his Hearing testimony to be the sort of man literally "controlled" by anyone), it draws the reasonable inference that Cormier and Robinson had agreed (given their prior close collaboration and their sharing of the Oppenheimer-stimulated information and goals as to Champion) to act together in the holding and voting (to the extent necessary to accomplish the already-discussed goals) of their stock.

---

**16.** As already indicated, O'Neil was soliciting all his customers to purchase shares of Champion, giving them his "sales pitch" on the four points leading to the contemplated sale of Champion (O'Neil 37). Various O'Neil clients made initial purchases of Champion shares in May and June (PX 15). Some of those clients would later respond (at O'Neil's request) by signing letters expressing their support for the (undisclosed) plans of the Cormier-Navon-RRH group (PX 26). Some of Russ's clients would do the same (PX 26).

32. Morris is the personal accountant for Cormier and for Cormier's various business interests, including Cormier Corporation. Morris has known and worked for Cormier for 20 years. Morris often talks with Cormier about Cormier's financial matters, including his stock purchases. Because of his role as Cormier's personal and business accountant, he knows much about Cormier's investments (M. Navon Tr.).

33. While Morris was in New Hampshire with Cormier in mid-June, Cormier said he was interested in investing in Champion and asked Morris for his thoughts. Cormier gave Morris Champion's annual report (which O'Neil had sent to Cormier), and Morris took it back to New York to study (M. Navon Tr.).

34. Morris discussed Champion with his brother Herman, an O'Neil client [17] (H. Navon 64). In mid-June O'Neil called Herman and recommended Champion as an "undervalued situation" (H. Navon 52–54). Herman gave him an order "on the spot" (*id.*). Within days Herman placed an additional order for 5,000 shares, and he later increased the order to 10,000 shares (H. Navon 62–63; PX 15). Herman trades stocks for himself and for other family members (H. Navon 5).

35. Morris and Herman discussed Champion again at a family breakfast June 22. Herman said O'Neil thought the real estate was undervalued and the inventory was much higher than necessary. On June 23 Morris telephoned Cormier to give Morris' views on Champion's annual report. Morris told Cormier that, based upon his analysis and conversations with his broth-er, he intended to begin buying. Morris then placed his first orders for Champion shares (M. Navon Tr.; PX 2).

36. Beginning a closely parallel buying pattern, Cormier placed his first Champion order (for 10,000 shares) the very next day, June 24 (PX 1). Morris continued to talk with Cormier about Champion throughout the month of June. Cormier knew Morris was buying [18] and other Navon family members were also investing in the company. Morris knew Cormier was buying (Cormier Tr.; M. Navon Tr.).

37. Morris and Herman have a network of relatives, friends and business associates (a number of whom know of Cormier and know the Navon brothers rely on Cormier's advice) who follow the Navon brothers' investment decisions. Morris or Herman or both told them about Champion, and they began purchasing Champion shares (M. Navon Tr.). Morris' relationships with those individuals are close: They are clients, past and present employees, relatives and friends on whom he was sure he could rely for support (M. Navon Tr.). Later O'Neil would label this group the Navon "puppies" (see n. 18), and he and Cormier would count their shares among the 42% controlled by Cormier (Cormier Tr.; PX 24, 26).

38. Morris believed all he had to say was that he and Cormier were involved and the Navon "puppies" would purchase stock (M. Navon 161). As one Navon "puppy" said when Morris recommended Champion: "If you like Champion and Odie Cormier likes Champion, I love it" (M. Navon Tr.; M. Navon 170). Navon "puppies" comprise some 33 individuals and entities owning

---

**17.** Herman had become an O'Neil client on Morris' recommendation, because Morris knew O'Neil was Cormier's broker and financial advisor (H. Navon 14–15).

**18.** Cormier denies he knew Morris was purchasing Champion shares until late September, when Morris talked with him after learning of Cormier's first Schedule 13D (Cormier Tr.). Under all the circumstances, that testimony is inherently implausible. Indeed Roland Nadeau (one of Cormier's "puppies") testified Cormier told him in late July that Morris had also bought Champion shares, giving the lie to Cormier's present denial (Nadeau 27). Parentheti-cally, this is the first occasion these Findings have had to use the term "puppies," and a few words of explanation are in order. No disrespect is intended by this Court for any of the individuals so designated by O'Neil. What is significant is that he, working closely with and acting for Cormier in the movement toward controlling Champion, viewed the support of those individuals as so dead-sure that he saw fit to label them in that fashion. And that label was of course based on Cormier's and Morris' having listed those persons as their controlled shareholders (see n. 31).

approximately 93,600 Champion shares [19] (PX 24, 26).

39. In light of the numerous intertwined relationships among Cormier and Morris and Herman (including their close collaboration and their sharing of the Oppenheimer-stimulated information and goals as to Champion), this Court draws the reasonable inference that they had agreed from the outset of their purchases of Champion shares to act together in the holding and voting (to the extent necessary to accomplish the already-discussed goals) of their stock. Because of the control exercisable by Cormier, that agreement embraced all Champion shares owned by Cormier Defendants; and because of the control exercisable by Morris and Herman, that agreement also embraced all Champion shares owned by Navon Defendants.

40. By the end of June Cormier Defendants, Navon Defendants and RRH had become a "group" within the meaning of 1934 Act § 13(d) that owned in the aggregate 5.4% of Champion's outstanding shares.[20]

### H. *1934 Act § 13(d) Violations by Defendants Other Than Hodes*

41. Despite that months-earlier formation of a statutory "group," no joint Schedule 13D was filed by Cormier, Navon or RRH until October 1986. Cormier Defendants did not file their first Schedule 13D until September 25, 1986 [21] (PX 1). Navon Defendants did not appear in any Schedule 13D until October 2, 1986 (PX 2). RRH did not file its first Schedule 13D until October 1, 1986 (PX 6).

42. By not filing a joint Schedule 13D when required and by omitting highly material facts once any Schedule was filed, Cormier and Navon Defendants and RRH concealed:

(a) their collective ownership of over 5% of Champion's shares;

(b) their joint agreement on the plans previously outlined, including their intention—if they acquired control of Champion—to implement the material changes already described, leading to a sale of the company in 18–24 months; and

(c) the existence of the other Oppenheimer-controlled accounts and the fact they were working in concert with Oppenheimer to accomplish their objectives.

Disclosure of the first of these items was not made until October 16, and none of the remaining items was disclosed until after this litigation had begun (PX 3, 5, 7). Nondisclosure of the first item might or might not have represented a material omission in terms of the potential effect on the investment decisions of other shareholders, but nondisclosure of the other items was certainly a material omission in that sense. Those intentions and plans on the part of a group of significant Champion shareholders, who were actively seeking to position themselves so they could implement those plans, was part of the "total mix" of information that 1934 Act § 13(d) required to have been made known to the market. Because such disclosure was not timely made and other shareholders were then trading in ignorance of material information, all subsequent acquisitions of Champion stock by members of the group were tainted by such nondisclosure, and all subsequent acquisitions of Champion stock by others later included in Cormier's claimed 42% "control" of Champion—stock also acquired in a market distorted by such nondisclosure—may also be subject to equitable restraints.

### I. *Hodes' Pre-filing Involvement in Champion*

43. Hodes first learned of the developing interest in Champion shares in May

---

**19.** As with (a) the Oppenheimer clients who expressed support in November 1986 and (b) the Cormier "puppies" (also so designated by O'Neil, see nn. 18 and 31), this Court has not treated the Navon "puppies" as part of the statutory "group" for Schedule 13D filing purposes. There is no proof of an express agreement with those persons as of the time the initial Schedule 13D should have been filed, and none will be inferred for current purposes.

**20.** Cormier Defendants owned 10,000 shares, Navon Defendants owned 18,525 shares and RRH owned 77,500 shares (PX 1, 2, 6) of the 1.9 million shares then outstanding.

**21.** Cormier Defendants' original Answer to Champion's Complaint ¶ 39(e) admitted their Schedule 13D was filed late. Later Cormier Defendants amended their Answer by denying their Schedule 13D was late.

1986 from Sheldon Gray ("Gray"), a client and neighbor (they live in the same building in Chicago) (Hodes Tr.). Hodes already knew generally of Champion, having been counsel for the underwriter of a Champion securities offering in the early 1970s (Hodes Tr.). Gray and his family had a business background in the automotive parts aftermarket, and Gray wanted to get back into that area of business. After Gray touted Champion to Hodes as a "takeover" candidate (PX 55), at Gray's suggestion Hodes set up a Saturday lunch meeting to discuss Champion, attended by Gray, Hodes and two of Hodes' senior law partners. Neither partner evinced any interest, but Gray and Hodes remained interested in Champion (Hodes Tr.).

44. About June 13 (before Hodes or Gray had bought any Champion stock), Russ called Hodes, whom he had known from Russ's days at Thomson-McKinnon (which had been the underwriter when they both worked on the Champion underwriting referred to in Finding 43). Russ asked Hodes' assistance in reaching Charles Schwartz ("Schwartz"), then Champion's President (now its Board Chairman) and then and now its Chief Executive Officer (Hodes Tr.; Russ 17–18; PX 13). Hodes told Russ he and his client, Gray, were contemplating taking a large position "with an eye toward effecting a change of control" (PX 13). Hodes therefore declined to call Schwartz on Russ' behalf (Hodes Tr.).

45. Hodes did, however, put Gray in touch with Russ. In mid-June Russ arranged for Hodes and Gray to talk with Russ client Silverstein. Hodes and Gray traveled to New York City to meet with Silverstein, Russ and O'Neil (Hodes Tr.). Silverstein would only engage in a friendly deal—he "likes to make himself known to the management . . . to see if he can work with management somehow" (PX 13 at 2; Russ 19–20). He did not want to join Hodes and Gray because, although they had "similar ideas as to value . . . they did

not agree about tactics"—referring to Silverstein's lack of interest in getting involved in the hostile takeover Gray contemplated attempting (PX 13; Gray 29–33). Hodes never revealed that takeover intention in any Schedule 13D (PX 9–12).

46. As reflected in earlier findings, Russ had already formulated, and communicated to Gray and Hodes, the predicates for a hoped-for Champion takeover (Gray 37–39). Gray spoke with Oppenheimer personnel (Russ and Metz) about the assertedly excess real estate and was told that there existed a "$19 value on the assets of the Company" (Gray 77). Russ told Gray Oppenheimer had obtained at least one appraisal (formal or informal) of Champion's Texas real estate (Gray 78). Hodes made notes on a page from Champion's 10–K concerning projected values of Champion's real estate, derived from either Russ or Gray (PX 40; Hodes Tr.).

47. On or about June 17 Hodes (who had not previously been an Oppenheimer customer, O'Neil 32) began purchasing Champion shares through Russ (Russ 17). At about that time Russ sent Hodes and Gray the memorandum he had prepared in May for Silverstein, memorializing Russ's and Metz's opinion on the asset values of Champion and a possible leveraged buyout for Champion (PX 14, 18; Russ 73–74).

48. Hodes and Gray bought Champion shares in tandem.[22] Each knew the other was buying (Hodes Tr.). Their purchases in June and early July clearly illustrate concerted activity (PX 9 at 8–9):

| | Champion Shares Purchased | | |
| Date | By Hodes | By Gray | Price |
| --- | --- | --- | --- |
| June 17 | 1,000 | 1,000 | 6–1/4 |
| June 17 | 1,500 | 1,500 | 6–1/8 |
| June 18 | 1,200 | 1,200 | 6–1/2 |
| June 19 | 250 | 250 | 6–9/16 |
| June 20 | 12,000 | 12,000 | 6–11/16 |
| June 23 | 1,200 | 1,200 | 6–5/8 |
| June 24 | 14,700 | 14,000 | 6–5/8 |
| July 8 | 2,000 | 2,000 | 6–13/16 |
| July 14 | 600 | 600 | 6–11/16 |

---

**22.** Hodes' testimony to the contrary is belied by the joint purchasing pattern reflected in this Finding. This was only one of several instances in which Hodes' testimony sought (unsuccessfully, in this Court's view) to distance himself from his now-ex-client Gray. As later Findings reflect, those efforts gloss over (or ignore entirely) the nature of Hodes' responsibility as a party to, and a lawyer-preparer of, the Hodes-Gray Schedule 13D filings.

49. As an initial move toward seeking control, early in July Russ spoke with John Gross ("Gross"), a member of Champion's founding family (see Finding 5) and now a Board member and a consultant to the company, to set up a meeting to discuss the Hodes-Gray plans [23] to recompose the Champion board and restructure the company (Russ 124–26). Before meeting with Gross, Russ discussed the upcoming meeting and plan with his office-mate O'Neil (Russ 125). O'Neil later relayed that information to Cormier (O'Neil 123).

50. On July 8 Russ flew to Chicago and met with Gross (Russ 123), his trip expenses being paid for by Hodes and Gray (PX 13, 19; Hodes Tr.). At the meeting Russ suggested different deals that could be struck between Hodes-Gray and John Gross (Russ 124).

51. On the night before that meeting, Russ had dinner in Chicago with Gray and told him Russ expected to receive compensation beyond brokerage commissions for his work (Gray 45–49). Gray was agreeable to some kind of extra financial arrangement for Russ (Gray 65–66). In fact, in mid-June Gray had suggested Russ become a financial consultant to Champion, an arrangement in which Russ was interested (Russ 144–45).

52. On July 14 (after the meeting with Gross) Russ sent a letter to Gray to memorialize their oral understandings. In part Russ said (PX 19, emphasis added):

> Secondly, I would like to confirm the second portion of our conversation.
> Specifically, I am referring to the oral understanding you and I discussed concerning my ability to optain [sic] an option on 2% of the stock of Champion Parts, up to a maximum of 10,000 shares. As we discussed, the option would be exercisable at $7.00 per share.

**23.** Again Hodes seeks to disavow common cause with Gray's takeover plans. Even if his version of events were wholly credited (a doubtful proposition in light of all the objective facts, including Hodes' later alacrity in joining forces with Cormier), it would make no difference in terms of Hodes' 1934 Act violations (see Findings 53–56).

**24.** Russ said the same (Russ 126):

Clearly this option is only awardable if

(a) *you and your group gain operating control* of Champion Parts

(b) you and your group initiate action *which leads Champion Parts to seek another group to gain control.*

## J. Hodes' 1934 Act § 13(d) Violations

53. By July 15 Hodes and Gray together owned 7.3% (138,750 shares) of Champion's stock (indeed, Gray's holdings alone then exceeded 5%). They disclosed their 5 + % interest in a Schedule 13D prepared by Hodes and one of his law partners and filed July 24, 1986 (PX 9).

54. At about the time of that first filing, Hodes sent Gray a chapter from a legal treatise captioned "Securities and Exchange Commission Problems—Takeover Bids" (PX 39). Hodes told Gray, "I think you should read it, Sheldon" (Hodes Tr.).

55. From the outset, Gray admittedly had a "program" "to take a major role in [Champion]" (Gray 193). That "major role" plainly involved a proposed takeover effort. In that respect Gray confirmed "I made my intentions very clear to Russ" [24] (Gray 193). Hodes' ambitions may have been less grandiose than Gray's, but he certainly shared Gray's intent to be more than a passive investor—to acquire Board representation if feasible—and he was surely aware of Gray's intentions. Despite that, the Gray-Hodes Schedule 13D dissembled as to those matters, thus concealing them from other Champion shareholders and the investing public. All the Schedule 13D said was that they intended to hold the shares "for investment purposes" (PX 9), yet there is no question Gray (and most likely Hodes as well) had clearly defined plans to take over Champion and influence its management.

> Sheldon Gray had said virtually from day one that what he wanted to do was get a large position in Champion Parts and recompose the board with he [sic], Sheldon Gray, as chairman. He wanted to bring in a new president, a new comptroller, and he wanted to make acquisitions for—he wanted to build the company through acquisitions.

56. In the Hodes-Gray July 24 Schedule 13D, Hodes (both as a principal and as a lawyer-preparer) failed to disclose:[25]

(a) their active present intent to join the Champion Board of Directors and either take over the company or assert an active role in its management; and

(b) in pursuance of that intent, their continuing negotiations with Gross (a Champion director and consultant) to join their group, and the fact they had spoken with him about the possibility of joining together to call a special shareholders' meeting.

Those nondisclosures were material items in terms of the investment decisions of other shareholders (see Finding 42). All subsequent acquisitions of Champion stock by Hodes were tainted by such nondisclosure.

### K. *Further 1934 Act § 13(d) Violations by Defendants Other Than Hodes*

57. Just as Russ negotiated for an option or consulting agreement with the Gray-Hodes group (see Findings 51–52), like discussions were undertaken with the Cormier-Navon-RRH group. O'Neil and Russ discussed with Robinson a similar arrangement for an "amount of options" or an equity stake in Champion once it was taken over (Russ 148–49). In addition, Robinson suggested to O'Neil that he go out to Chicago as a representative of the investors (O'Neil 171). O'Neil declined, but suggested Russ for the job (O'Neil 172). Russ was to be "a watchdog for the investors" (Russ 146).

58. Both Robinson and Cormier contemplated the Oppenheimer brokers would be involved after Champion was taken over. Robinson told O'Neil he wanted someone to go out to Chicago and "babysit" his investment, to "find out what is going on inside" Champion (O'Neil 172). Cormier wanted Russ to act as "eyes and ears" for Cormier and Robinson (Gray 177). Russ was to take an untitled position as a financial consultant first, an arrangement that could escalate into his becoming "a chairman of the board type of figure" (O'Neil 172; Russ 146).

59. Those arrangements with Russ and O'Neil (to take effect post-takeover) were discussed among the participants long before any takeover plans were disclosed. As early as mid-August, Cormier and O'Neil discussed bringing Russ over to Champion to "look into the four points" leading to the sale of Champion, "after terminating at Oppenheimer" (Cormier 57–58). Russ understood he was to receive $11,000 per month for those services in addition to "other compensation" in the form of options for the shares of Champion[26] (Russ 147–48).

60. Nothing about those proposed arrangements was disclosed in the relevant Schedule 13D filings by Cormier and his group. Some information in that respect was finally confirmed (but not adequately disclosed) months later in a November 25 Schedule 13D amendment, which referred obliquely and misleadingly to Champion "retaining an independent financial consultant" (PX 12). By contrast, just four weeks later Cormier-Navon Defendants' Trial Mem. 8 admitted Cormier's "principal belief was that Russ, an outsider familiar with the industry, should go on the payroll at Champion to look into these issues...."

---

**25.** Both Hodes' testimony and his proposed Findings seek to gloss over the Schedule's material omissions by pointing to the inability of Gray and Hodes to implement their intentions because their stockholdings were too small to enable them to take control. That of course distorts the nature of the disclosure obligations under 1934 Act § 13(d).

**26.** All these extraordinary arrangements (and an offer by Robinson to set Russ and O'Neil up in business if they ran into problems at Oppenheimer (Gray 148–49), as indeed seemed possible (PX 13)) confirm that the role played by Russ and O'Neil was not that of mere stockbrokers entitled to commissions for order-taking. On the contrary, it buttresses this Court's conclusion they were agents for the group members, acting with broad authority and able to serve as the mortar cementing the various agreements Cormier and Navon denied (unpersuasively) in their testimony.

*L. Post-Initial-Violation Events: August-September 1986* [27]

61. On August 6 a short article about Standard Motor Products appeared in the *New York Times*. Standard Motor had recently purchased a division of a company in a line of business similar to Champion's (O'Neil 107). O'Neil clipped the article and wrote on the bottom of the page, "if Champion were sold in a private transaction at the same multiple, we would get $30 per share" (PX 20; O'Neil 107). O'Neil promptly sent copies of the article—with the handwritten reference to what "we" would receive upon sale of Champion—to all his clients (O'Neil 101; PX 20).

62. O'Neil called Cormier with the same message the same day the article came out (O'Neil 110). Cormier understood O'Neil's reference to a "private transaction" to mean "selling the entire company to somebody" (Cormier 95). Cormier and O'Neil again discussed their plans (see Findings 23–25) to "increase" Champion's book value, leading to the sale of Champion in approximately two years (Cormier 83–84, 98).

63. Throughout the summer of 1986 Russ was also discussing the sale of Champion with his client, Gray. Russ solicited Gray's suggestions as to possible acquirers (Gray 121–23). Russ told Gray that, based on the Standard Motor transaction, he believed Champion could be sold for $75 million (Gray 103–05), as contrasted with its then total market valuation of less than $20 million.

64. In August or early September [28] O'Neil and Russ set up a meeting at the office of RRH (Russ 130; O'Neil 124–26), attended by Hodes, Gray, Robinson, Russ and O'Neil (Gray 133). Cormier (though invited) did not attend the meeting, but O'Neil promptly reported to him what took place (Cormier 213). It was at this meeting that O'Neil informed the participants Cormier's attendance was not necessary because "Mr. Robinson controlled Mr. Cormier" (but see Finding 31) [29] (Gray 133). At the meeting Gray told Robinson he wanted to "take over" Champion (O'Neil 70, 128).

65. Shortly thereafter Russ prepared a detailed five-page memorandum (PX 21) "relating to the substance of the meeting" (O'Neil 127; Russ 134). Though captioned "Management Reorganization and Corporate Strategy," the memorandum was really a takeover blueprint:

*Management Reorganization and Corporate Strategy*

I. Management Reorganization

  A. 13–D Holders call for Special Shareholders Meeting

   1. Groups calling for special shareholders meeting

|    |          |     |
|----|----------|-----|
| a. | Hodes-Gray | 8% |
| b. | Robinson | 5% |
| c. | Cormier | 10% |
| d. | Gross | 12% |

   2. Proceed to arrange for meeting

   a. obtain shareholders list

   b. go to court to force meeting if necessary

    1. 13D groups excluding Gross meet to arrange cost sharing if and when a fight breaks out

   3. Upon presentation of demand for shareholders meeting, try to get Schwartz to peacefully agree to reorganize management i.e. have directors resign to be replaced by 13D nominees

---

27. As the further Findings will reflect, some of the events that followed the initial 1934 Act § 13(d) violations by the Cormier-Navon-RRH group and the Hodes-Gray group were themselves additional violations, while others are probative as confirming the undisclosed intentions of the groups already discussed. In any case, all are relevant.

28. Russ and O'Neil testified the meeting took place in early August, while Hodes believes the meeting was in early September.

29. At the meeting Robinson described the earlier Cormier-Navon-Robinson-O'Neil involvement with United Federal Savings Bank as "a situation where he tried to take over a company in conjunction with Mr. Cormier" but "didn't, in his words, handle the matter properly and had their head handed to them by the opponents" (Gray 136–37). Robinson said Cormier and O'Neil and he lost the shareholder vote, but "next time he [Robinson] would be in a deal where he had all the chips on his side of the table" (Gray 137).

B. Should Schwartz not immediately agree to a change

1. Initiate proxy fight

13D groups meet to agree on a full slate of directors

C. The Proxy battle

1. Nominees for reorganized board should include following characteristics

a. stock ownership in size

b. broad range of business disciplines

c. automotive experience

2. areas of weakness for 13D groups proxy battle

a. Sheldon Gray-bankruptcy

D. Assuming Victory

1. Board reform so that nominees of 13D groups replace principals of 13D groups

2. the 13D groups agree upon working nominees who will be responsible for implementing a corporate strategy to attain asset value

3. active board—for at least one year after victory have monthly board meetings.

66. Whether prepared in mid-August or September, the memorandum shows the "Cormier" holdings at 10%, reflecting the reality (with which these Findings are consistent) that the Cormier-Navon holdings should be treated as one. There was no Schedule 13D disclosure of that fact to anyone outside the group until October 2 (PX 2), though the Cormier-Navon holdings alone (even without the RRH holdings) crossed the Section 13(d) 5% filing threshold August 7.[30]

67. Immediately after the meeting in Robinson's office, Hodes, Gray and Russ went to Oppenheimer headquarters and met with Metz and Weinger (Gray 138–40). Metz told them (Gray 140):

(a) He would remain in the investment as long as it "looked like everything was going to escalate."

(b) He thought it was interesting that the group was "making a play," and wished everyone well.

68. At dinner that evening O'Neil recommended to Hodes, Gray and Russ that they quickly "move on" Champion and its management to take control (Gray 144–45). Gray was concerned the timing could injure Champion by placing it "under siege" at the time of the annual convention of the Automotive Warehouse Distributors Association, the most important annual industrywide gathering (Gray 145–47). That potential problem did not trouble O'Neil, who "was going to do what he was going to do irregardless [sic] of the consequences" (Gray 147).

69. In August Cormier completed his "final evaluation" of the already-discussed takeover plan (Cormier Tr.). Cormier also dramatically increased his orders for Champion shares: As contrasted with his previous limitation on his orders with O'Neil to 10,000 shares each, Cormier now increased his total buy order to 100,000 shares—the aggregate amount of money he and his immediate family group had available (Cormier 154–55). As Cormier put it, "I just told [O'Neil] that whenever—that if and when the stock became available to buy it" (Cormier 155).

70. Cormier encouraged various employees, relatives and acquaintances (his "puppies," see n. 18) to buy Champion stock [31] (Cormier Tr.; Cormier 200–06). Cormier told his "puppies" they could make money in the stock, and others—such as

---

**30.** In confirmation of Cormier and Navons' parallel buying patterns and of O'Neil's side-by-side buying for his clients, on August 7 Cormier Defendants owned 50,000 shares and Navon Defendants owned 50,025 shares (PX 1, 2). That total of 100,025 shares is 5.1% of the 1.9 million shares then outstanding.

**31.** On October 24, after Cormier and O'Neil represented they controlled 42% of the stock, Champion asked for evidence (the Cormier and RRH Schedule 13Ds showed ownership aggre-

gating only some 20%) (Schwartz Tr.). Acting as spokesman for Cormier, Morris and Herman, RRH and the other shareholders included in the 42%, O'Neil collected documentation of the group's shareholdings for submission to Champion (PX 26). Each of Cormier and Morris gave O'Neil a list of Champion shareholders whose shares he controlled (Cormier Tr.; M. Navon Tr.). O'Neil titled one "Cormier Puppies" (PX 23), the other "Navon Puppies" (PX 24).

Morris—were also aggressively purchasing Champion shares (Nadeau 24–27). When asked if he could "recommend" Champion shares, Cormier replied he "felt very confident" (Cormier 190). He also told at least some of his "puppies" about the impending change in control at Champion (Nadeau 42).

71. Cormier "recommend[ed]" that his employees, relatives and friends purchase Champion shares until, by late October, some 23 such individuals and entities had acquired 87,000 shares (PX 23). Cormier had "no doubt in [his] mind" that all of his "puppies" would "vote" for him and support him in the plans he had for Champion (Cormier Tr.; Cormier 34, 36). As Cormier stated with respect to his "puppies": "the local people ... would be behind me" (Cormier 165). Despite his certainty that he could count on their votes—he was not, he testified, "running a bluff" (Cormier Tr.) [32]—Cormier has never filed a Schedule 13D including them as part of his group, nor has he ever disclosed the fact of their "certain" support, even in the post-Hearing Schedule 13D filed January 9, 1987.[33]

72. At least one of the "puppies," Pauline Eastman, a life-long friend of the Cormiers and the real estate broker for whom Cormier's wife works as a salesperson (P. Eastman 17–18), was introduced to O'Neil by Cormier (Cormier 129). Eastman and her son then bought over 16,000 shares of Champion through O'Neil (Cormier 130; P. Eastman 57–58). At all times Cormier assumed the Eastmans, as well as the other "puppies," would support him (Cormier 165–70). Roland Nadeau said he considered himself to be part of Cormier and Navon's group, and he had given Cormier the right to vote his stock (Nadeau 60–62).

Nadeau reacted enthusiastically to the prospect of a Cormier-led takeover (Nadeau 30).[34]

73. Cormier kept his "puppies" generally advised as to Champion, sending them newspaper articles and clippings about the company (Cormier Tr.; Cormier 131). For example, an October 1 *Chicago Tribune* article about Champion was rapifaxed from Hodes to Russ, who gave it to O'Neil, who mailed it to Cormier, who gave it to Pauline Eastman, a Cormier "puppy" (Cormier 134; P. Eastman 43–56; PX 25).

74. Cormier periodically communicated with his "puppies" and asked about the extent of their stockholdings (the reasonable inference is he did so to monitor just how much stock he controlled through the "puppies"). That information was provided to him before October 23 (Nadeau 37).

75. By contrast, in dealing with Champion Cormier played his cards close to the vest (continuing his failure to make public disclosure). He made no response whatever to Schwartz's August 6 letter to Cormier Corporation welcoming it as a shareholder and offering to answer questions or to provide additional information (Schwartz Tr.; PX 31). When Schwartz finally talked with Cormier in late September (after repeated attempts to reach him), Cormier said only he had purchased his Champion shares for "investment purposes." He did not mention any aspect of his true intentions or any of the other members of the group (the Navons or RRH) or the "puppies" (Schwartz Tr.). On October 2, Schwartz sent Cormier another letter suggesting a meeting and offering to provide additional information on the company (PX 32). Similarly, after the Navon Defendants

---

**32.** Cormier's lawyers attempted to characterize his statement that he controlled 42% as mere "puffing, posturing and exaggeration" (Cormier-Navon Trial Mem. 15). Cormier flatly contradicted that assertion at the Hearing, testifying his statement that he controlled 42% was *not* posturing and was, in fact, true (Cormier Tr.).

**33.** This area of the law—whether it is necessary to disclose the existence of a volunteer militia quite certain to respond to a call to arms, as contrasted with enlisted troops—is not entirely clear. Resolution of that question is unnecessary to these Findings and Conclusions.

**34.** As though to confirm how justified his confidence in their support was, Cormier communicated with each of the "puppies" subpoenaed for deposition in this case. Before they testified Cormier arranged to speak with them in his office at Cormier Corporation, and he arranged for them to meet with his lawyers. None of the "puppies" was represented by his or her own counsel (Cormier 261–64; Clark 8–12; P. Eastman 10–14; Nadeau 13–14; Poire 7–9).

were finally added to the Cormier Schedule 13D (PX 2), Schwartz sent Herman an October 7 letter enclosing information on the company, welcoming him as a shareholder and offering to meet, sending a copy of the letter to Cormier (Schwartz Tr.; PX 33). Schwartz never received a response (Schwartz Tr.).

76. Meanwhile Hodes and Gray continued to buy Champion shares through Russ. In addition, at some time after his July 8 meeting with Gross, Russ identified Hodes and Gray as his clients to Gross. Hodes and Gray later met with Gross to solicit his support for their plans (Hodes Tr.; Hodes 97), and Hodes drafted a proxy for signature by members of the Gross family (Hodes Tr.). Hodes, a skilled practitioner in corporate and securities law, knew adding the Gross family shares would give the Hodes-Gray group more than 20%—enough shares, under Illinois law, to call a special shareholders' meeting and (with cumulative voting) to elect at least two directors to the Champion Board (Hodes Tr.).

77. Hodes and Gray met with Schwartz, Champion's chief executive, on August 5 at a restaurant in Chicago. Gray had prepared three pages of plans and options for Champion (PX 56), listing respectively:

(a) a ten-point plan for the company, including installing a new chief operating officer;

(b) eight separate questions for the lunch meeting with Schwartz, including restructuring the Board of Directors, naming Gray as Vice Chairman of the Board, and selling the company at book value or higher; and

(c) two options: one if Schwartz stayed with the company (presumably after a change in control), and one (including replacement of the board) if Schwartz left.

According to Hodes, those were Gray's ideas (Hodes Tr.). Some were discussed at the meeting (Hodes Tr.), but none was ever disclosed on any Hodes-Gray Schedule 13D. Gray gave Hodes all three pages of PX 56,

though perhaps not as a group (Hodes said he received the second page on August 5 at the lunch meeting) (Hodes Tr.).

78. Consistently with Findings 55–56 as to the intention of Hodes and Gray to acquire seats on the Champion Board, they specifically requested such seats at their August 5 lunch with Schwartz (Hodes Tr.). Again Hodes and Gray at no time disclosed the fact of their seeking board representation in any Schedule 13D.

79. Later, in preparation for the Robinson-office meeting (see Finding 64), Gray wrote a letter to Hodes dated August 29, 1986,[35] listing a compensation program for a new president and chief executive officer, "worked out" by Gray "with the help of candidates for President and C.O.O." (PX 41). That letter reflects a clear intention to replace Champion's top management. Hodes claimed (a) he was unaware of Gray's actions (active solicitation of candidates for management positions) until the day he saw the letter and (b) he disagreed with Gray and told him not to mention the subject in the meeting with Robinson, but Hodes acknowledged Gray did raise the subject of board representation with Robinson at that meeting (Hodes Tr.).

80. As was true of the initial Gray-Hodes Schedule 13D, Hodes and his law partner Sidney Sosin drafted all the Schedules 13D later filed by Hodes and Gray (and still later by Hodes, Gray and John Gross) (Hodes Tr.; PX 9, 10, 11, 12). At all those times (irrespective of his alleged agreement or nonagreement with Gray) Hodes was fully aware of Gray's intentions and plans as to taking control, reconstituting the Board of Directors and replacing Champion's top management. Yet those intentions and plans were never disclosed in any Schedule 13D.

**M.** *Post-Initial-Violation Events: More as to Defendants' Board-Representation Intentions*

81. During the late summer O'Neil and Russ became actively involved in the plan-

**35.** Hodes testified he did not receive the Gray letter until they were in the elevator on the way to the meeting with Robinson. This Court need not resolve the credibility of this or other Hodes efforts, described in this Finding, to dissociate himself from his erstwhile client. What Hodes cannot plausibly deny is the level of his *prior* knowledge that triggered disclosure obligations (see Findings 55–56).

ning of various defendants for board representation. In August O'Neil called Hodes for advice on calling special shareholder meetings under Illinois law [36] (Hodes Tr.). Hodes transferred O'Neil to his partner Sosin, and Sosin prepared an Agreement and Proxy calling for Hodes, Gray and O'Neil to be placed on the Champion Board at a special meeting once Schwartz and six other board members were removed (PX 22). Sosin left blank spaces to list other new board members (presumably four). Sosin gave Hodes a copy and sent the materials to O'Neil by Federal Express August 20 (Hodes Tr.; PX 22). O'Neil thought the idea sounded "interesting" (O'Neil 161).

82. Some time in mid-September O'Neil told Russ that Robinson wanted Russ to serve on the Board [37] (Russ 140). During that conversation O'Neil mentioned other candidates for the new board included Cormier, a Navon representative and Roy Whitney ("Whitney") (Russ 141). Whitney is a client of Russ' and a partner in Hammond & Kennedy, "which is a merger and acquisition leveraged buyout financial intermediary firm" (Russ 141).[38]

83. After Robinson filed his initial (October 1) Schedule 13D, Robinson told O'Neil he thought it "would be a good idea" for O'Neil to be on the Board and said "he didn't see why [O'Neil] couldn't represent his stock on the board" (O'Neil 163). Cormier also authorized O'Neil to seek a seat on the Board "in our behalf, in the family's behalf in the investment we had" (Cormier 236).

84. Also in October, Cormier talked with Thomas Healy, one of his business associates and "puppies" (PX 23), about Healy's possible service on the Champion Board (Cormier Tr.). After this Court commented on that admission at the close of Cormier's cross-examination and after Cormier's counsel had waived any redirect examination, his counsel recalled Cormier for the sole purpose of allowing Cormier to retract all his testimony about Healy's Board membership. Cormier offered no explanation for his altered recollection [39] (Cormier Tr.).

85. O'Neil also discussed his potential election to the Board with several of his clients, including Herman and at least three others with whom he had been parking Champion shares (O'Neil 164). Yet throughout the entire August-September period, while defendants were parceling out the slots on the Board they anticipated they would control, Champion shareholders and the investing public had no accurate idea from defendants' Schedule 13D filings of either (a) the number of Champion shares defendants actually controlled (a material misrepresentation) or (b) their plans for Champion (a material omission) (PX 1-3, PX 6-7, PX 9-11).

86. Meanwhile O'Neil, Russ and Robinson had felt concerned enough about their role in the emerging takeover to consult a lawyer. At Russ' suggestion they retained Henry Cortesi ("Cortesi"), a partner in the New York firm of Webster & Sheffield (O'Neil 138-39, 146-48; Robinson 141-43).

36. Russ had earlier telephoned Hodes seeking information on the effects of cumulative voting (Hodes Tr.; PX 60 at 3).

37. Russ later discussed his availability directly with Robinson (Russ 140).

38. Russ and Whitney met when Russ was working at Thomson, McKinnon as an investment banker (Whitney 29-30). Russ knew Whitney was a merger and acquisition and leveraged buyout expert (Russ 141). Russ introduced Whitney to Robinson (Whitney 50-54). At the conclusion of their meeting, Whitney felt he and Robinson "could have some fun—in my definition of fun—together" with respect to Champion (Whitney 67-68). Whitney's "definition of fun" was plain: He had no experience in the auto parts aftermarket (Whitney 18-19); instead his expertise was in leveraged buyouts. Obviously his participation in the "fun" would relate to the sale of Champion after implementation of the Cormier-Navon-RRH group takeover plan it had intended all along, but had never disclosed.

39. Cormier's lack of candor on this minor point was of a piece with his disingenuous version of the facts, in which he claimed he suddenly woke up to his control position in Champion as he was en route to meet with its management in late October—a meeting previously set up to discuss (among other things) Board representation for Cormier and his cohorts.

87. O'Neil, Russ and Robinson had attended a meeting concerning Champion in Cortesi's office (O'Neil 139; Russ 195–96, 198–201, 203–04; Robinson 140–41). Cormier knew O'Neil and Russ had consulted counsel. Indeed, he agreed with Robinson to split the legal fees, just as he had shared legal fees and expenses with Robinson in connection with the United Federal Savings Bank merger fight (Cormier Tr.). As with other aspects of his testimony, Cormier tried to downplay the obvious fact of his linkage with Robinson, instead saying Cortesi was representing him in connection with Champion by advising O'Neil and Russ on "how to keep from stepping on land mines" (Cormier Tr.).

88. Cortesi also acted directly on behalf of Cormier and Robinson. He drafted a proposed amendment to the Cormier 13D, adding RRH as a member of the group, and sent it to Cormier on October 16 along with a proposed engagement letter (DX 4; PX 58). Although Cormier would not sign the engagement letter, he used the text of the draft amendment, agreed to share in paying Cortesi's fees and repeatedly called on Cortesi for legal counsel during October and November (Cormier Tr.).

**N.** *October 23 Meeting and Its Aftermath*

89. At Schwartz's suggestion, on October 22 he met with Robinson in New York. Robinson did not mention defendants' takeover plans, despite the fact that they were now so specific as to include discussion of what persons were to go on the Champion Board (Schwartz Tr.).

90. Schwartz had also attempted to arrange a meeting with Cormier in New Hampshire, but Cormier explained he could not meet because he had plans to visit Hodes in Chicago. Cormier agreed to meet with Schwartz in Chicago October 23, after his meeting with Hodes. Once again Cormier made no mention of his group's by-

now-crystallized takeover plans (Schwartz Tr.).

91. After his October 22 meeting with Robinson in New York, Schwartz called O'Neil to see if they could meet. O'Neil said he didn't have time that day (Schwartz Tr.). In fact, O'Neil was preparing to travel to Chicago to help Cormier present—and if possible execute—the Cormier-Navon-RRH group's takeover plans.

92. On the afternoon of October 23, Cormier and O'Neil appeared at Champion headquarters and announced to Schwartz their group controlled the votes of 42% of Champion's shares (Cormier Tr.; Schwartz Tr.; Savini Tr.; Cormier 164–65). Cormier demanded the resignation of all ten members of the Champion Board, to be replaced by him and other members of his group. He also revealed the plan to restructure Champion based upon the now-refined elements of the initial "four point" takeover plans (Cormier Tr.; Schwartz Tr.; Savini Tr.; Cormier 254–55). At that point Cormier's announced plans—paralleling the essential goals intended from the very outset of his group's purchases, though with some refinements as to the particular means for implementing these goals—were to:

    (a) sell the "undervalued" real estate to the major stockholders;

    (b) cut back the inventory;

    (c) factor the accounts receivable; and

    (d) broaden the marketing base.[40]

Finally, in a direct tracking of the group's ultimate intention from the very beginning, Cormier said Champion should then be sold (through Oppenheimer) within two years for $24 per share (Cormier Tr.; Schwartz Tr.; Savini Tr.). Cormier's announced intentions, first disclosed to Champion October 23, were finally referred to in an amendment to Cormier's Schedule 13D filed over a month later (November 25) (PX 5; Cormier 255).

---

**40.** As indicated, these components effectively echoed the "four points" Cormier discussed with O'Neil in June and "expounded" upon in the "Reorganization Strategy Memo" (PX 17; Cormier Tr.). Two added fillips seem to be present at this later point: (a) sale of the real estate on

an insider rather than outsider basis; and (b) addition of a proposal to factor accounts receivable—a common, costly technique to generate cash quickly. Both are, of course, consistent with the group's plan to sell Champion after the takeover.

93. Cormier and O'Neil told Schwartz [41] that the 42% was calculated by adding (a) the shares held by the Cormier-Navon-RRH 13D filing group, (b) the Cormier and Navon "puppies'" shares and (c) the shares that had been parked in the various Oppenheimer accounts by defendants' broker-agents (Cormier Tr.; Schwartz Tr.; Russ 167; Cormier 173, 175; PX 34). On that basis Cormier and his broker, O'Neil, claimed "working control" of Champion (Cormier Tr.; Schwartz Tr.).

94. Cormier testified he and O'Neil first realized their group controlled Champion when they tallied up the shares on O'Neil's pocket calculator in a waiting lounge at O'Hare Airport October 23, before meeting Gray and driving downtown for a preliminary meeting in Hodes' office (Cormier Tr.).[42] As of October 23 Cormier himself owned 153,850 shares, representing an investment of approximately $1 million (PX 1, 2). O'Neil, who kept careful records of his Champion sales (PX 15), had then sold hundreds of thousands of Champion shares. As with Cormier's "guesstimate" concoction (see n. 42), Cormier's entire assertion of his and O'Neil's first having become aware of "working control" of Champion October 23 [43] is equally unbelievable and is also rejected.

95. Cormier and O'Neil returned to Champion October 24. They provided more details on the shareholdings that made up the 42%, and they announced Champion should hire Russ as a financial consultant to evaluate and implement the Cormier-announced plan (Cormier Tr.; Schwartz Tr.). Schwartz made notes of some of the claimed shareholdings, including shares controlled by Metz and Russ and shares held by "Odie's friends" (Schwartz Tr.; PX 34). When the discussion turned to the manner in which new directors might be elected, Cormier and O'Neil telephoned "their lawyer" Cortesi for advice (Schwartz Tr.; Cormier Tr.). On the same day Champion issued a press release announcing Cormier's claim of "the support of a considerably larger number of shares [than those reflected in defendants' Schedules 13d]" and his request for "Board representation reflecting [his group's] ownership interest" (PX 35).

96. Cormier's October 23 announcement of control flatly contradicted the previously-filed Schedules 13D. Champion's counsel therefore asked for confirmation of the claim of working control. Russ and O'Neil began to solicit letters from their clients confirming support for the Cormier group, expecting the Board to resign and turn control over to them.

97. Acting as the "appointed representative" for Cormier and Robinson (Gray 154), O'Neil asked Cortesi (the attorney representing the group, O'Neil 194) to provide him with the text of a letter shareholders could write to establish their support for the group and its plans (O'Neil 194, 197; Russ 177). O'Neil then took the form letter and dictated it over the telephone to his clients, who sent it back to O'Neil on their own stationery (O'Neil 197–98; Dusoe 27; PX 26). O'Neil's clients, such as Leon Dusoe, a New Hampshire bank trust officer, knew the letters were to be used in connection with a change in control at Champion (Dusoe 14–22). O'Neil also gave the letter to Russ (Russ 176), who dictated it to three

---

41. Schwartz was "stunned" by the Cormier-O'Neil claims not only because of the disparity between those claims and the Cormier-RRH Schedule 13Ds, but also because Schwartz had inquired on numerous occasions during the summer and early fall of 1986 and was consistently told the Champion purchases were being made for "investment purposes" (Schwartz Tr.; PX 31–33).

42. Cormier said that calculation was based in substantial part upon Cormier's "guesstimate" of the "normal amount" his "puppies" would own, even though he later testified he did not know some of them and was not fully aware of their finances and financial condition. That attempted explanation is truly incredible. One "puppy," Nadeau, confirmed Cormier had communicated with him during the summer to monitor the extent of his holdings (Nadeau 37). Even apart from such confirmation, Cormier's story simply will not wash, and this Court rejects it.

43. On cross-examination Cormier changed his testimony, saying he had made his own "tape" of the share totals that morning (Cormier Tr.). That too cannot accurately portray his claimed unawareness of his group's holdings and working control *before* that date.

of his clients, who in turn agreed to send the letters (Russ 179–82; PX 26). O'Neil also sent a copy of the letter to George, another Oppenheimer broker (George 52; O'Neil 204), who also dictated the letter to his clients, who likewise sent the prescribed text back to him on their own stationery (PX 26).

98. While the Cormier-Navon-RRH group broker-agents were soliciting letters from their clients, Cormier spoke to his own "puppies" to prove his control over another significant percentage of Champion's stock (Cormier Tr.; PX 23). Because Cormier was certain the "puppies" supported him, he merely had to ascertain their shareholdings to establish how much stock he controlled. At Cormier's direction, Morris similarly spoke to his "puppies" and prepared a list documenting the number of shares they owned (M. Navon Tr.; M. Navon 152–54; PX 24). Once Cormier and Morris prepared their lists, which specified names and numbers of shares owned, they sent them to O'Neil to be forwarded to Champion (Cormier 206–07; M. Navon 152–53). Before sending the Cormier-Navon lists to Champion, O'Neil titled the shareholder lists "Cormier Puppies" and "Navon Puppies" (Cormier 209). Then the letters and lists of "puppies" were sent to Champion (PX 23, 24, 26).

99. Hodes also prepared a letter (dated November 4, 1986 but delivered, he says, two days later to the office of Champion's legal counsel) using identical language and adding his shares to the Cormier-Navon-RRH group (Hodes Tr.; O'Neil 312; PX 26). Hodes took that action when he knew Gray was selling his shares, as part of Hodes' continuing attempt to join in an effort to gain control of Champion.

100. Hodes met with Cormier, O'Neil and Russ after their October 23 meeting with Schwartz [44] and kept in close touch with them from that time until the November 7 Board meeting (Hodes Tr.; PX 60, 61). Hodes had already prepared the necessary papers to initiate a call for a special shareholders' meeting, even to the point of obtaining signatures from Kray & Co., the nominee holder of Hodes' stock (Hodes Tr.; PX 63). Hodes also gathered materials— including Robinson's letter to the Chairman of United Federal Savings Bank—that could be used to warn Champion board members of their potential liability for damages if they refused to call a special shareholders' meeting (Hodes Tr.; PX 47).

O. *November 7 Board Meeting, Its Prelude and Its Aftermath*

101. Hodes claims he did not know he was being slated for the Champion Board until he arrived at the November 7 meeting. That testimony is belied by his premeeting conduct, including his November 4 (or 6) offer to O'Neil (who acted as spokesman for the group throughout the period) to join the Cormier or RRH Schedules 13D and—more directly—his November 6 conversation with Whitney in which they discussed their prospective Board service (O'Neil 312; Whitney 127). Schwartz also testified he learned Hodes was a Cormier Board nominee before November 7 (Schwartz Tr.; Rosen 59–61).

102. O'Neil acted as spokesman for the group throughout the October 24–November 7 period. When Champion's counsel requested biographical information on the proposed new directors, O'Neil acted as the designated intermediary (PX 36). He was to disseminate the necessary SEC forms and detailed director questionnaires to the group's nominees (PX 36).

103. On November 6 Oppenheimer bought Gray's entire 145,000 share position in Champion [45] (Russ 186). Oppenheimer's

**44.** On cross-examination, Hodes answered "no" to the question whether he had dinner that evening with Cormier, O'Neil and Russ at the Standard Club. When Champion's counsel changed the form of the question, Hodes acknowledged he had met with them—but at Binyon's, *not* the Standard Club. Such literal responsiveness cannot of course be faulted—it involves no misrepresentations—but it causes a

trier of fact to ponder how many other answers would have painted a different picture had opposing counsel known enough to reframe their questions.

**45.** Gray had demanded that Oppenheimer do so. He felt Oppenheimer had breached an agreement or understanding with him (Gray 193; O'Neil 207). He told Russ, "Take me out of my

legal department told O'Neil and Russ to "find a place for [Gray's] stock" (Russ 186). Cortesi, acting for Cormier, RRH, Russ and O'Neil, negotiated the sale in a series of late night telephone calls from his apartment (with Russ and O'Neil present) to Gray and his attorney in Chicago. Next day Russ and O'Neil (along with George) "found buyers for the stock," allocating it primarily to Cormier, Morris and Herman, RRH and Whitney [46] (O'Neil 208, H. Navon 117–18). In what is a "very uncommon" occurrence, neither Russ nor O'Neil received a commission on the sale (Russ 188). Oppenheimer paid Gray $12,000 for legal fees and sought general releases from him on behalf of Cormier, Morris and Herman (Gray 193; PX 42–46).

104. On November 7 Cormier went to Chicago to meet with Schwartz and Champion's Board of Directors (Cormier 256–59). Cormier told Schwartz he and his group now controlled over 50% of Champion's shares because his group had purchased Gray's shares through Oppenheimer (Schwartz Tr.; Cormier 258–59). Once again he restated his "four point" takeover plan and his intent to sell Champion at twice its current share value in 18 months (Cormier Tr.; Schwartz Tr.).

105. At the same meeting the Cormier-Navon-RRH-Hodes group demanded at least six seats on Champion's Board, control of its executive committee and control of its proxy machinery (Schwartz Tr.). Hodes told Schwartz the group was Champion's new management and control had changed (Schwartz Tr.; Savini Tr.).

106. After the November 7 Board meeting, Cormier told Hodes to prepare the papers necessary to call a special shareholders' meeting (Hodes Tr.; Navon Tr.). Though Hodes says he opposed such a course, he had numerous telephone calls

over the next week with Cortesi (PX 60, 61), and he appears to have functioned as the group's local counsel before this action was filed.

107. Neither Hodes nor any of the other defendants disclosed their alliance or agreement on Board representation in any Schedule 13D. Indeed it was not until November 25, after this action was filed, that the group even referred to its long-held "four point" plan in a Schedule 13D amendment (PX 5). That amendment confirmed—but in a wholly misleading fashion—the group's plans (a) to reorganize Champion according to the "four point" takeover plan and (b) thereupon "make it available for sale in eighteen months" (PX 5, p. 18; see also PX 59).

P. *More on the Subject of Credibility*

108. Earlier Findings have referred to instances in which this Court finds certain defendants' testimony lacking in credibility, but those specific references should not give rise (by negative inference) to the conclusion that they were intended to be exhaustive. On the contrary, defendants' justifications for their failures to disclose were inherently unbelievable in general. They disavowed the writings that confirm their plans,[47] exhibited convenient and frequent memory lapses, professed ignorance of their clearly parallel buying and "explained" their common actions as the product of coincidence, blind confidence in their associates and intuitive brokers. Defendants other than Hodes also acknowledged the early existence of the takeover plans, yet continue to assert (conveniently but improbably) they did not formulate the intent to pursue those plans until much later.

109. Defendants' explanations for their conduct were likewise often inconsistent, self-serving and incredible. Cormier in

stock. You put me in, you take me out" (Gray 191, 193).

**46.** Their purchases were: Cormier, 25,000 shares (Cormier Tr.); Morris and Herman, 10,000 shares each (M. Navon Tr.); Whitney, 20,000 shares (Whitney 83); RRH, approximately 20,000 shares (O'Neil 208; PX 8).

**47.** Champion's counsel perceptively point out that the key memoranda (PX 13, 14, 17 and 21) consistently lack dates. Though this Court has not accepted counsel's suggested conclusion from that fact ("logical inference is that the omissions were deliberate"), it became necessary for this Court to place greater reliance on circumstantial evidence to piece together the facts.

particular changed critical testimony several times at the Hearing, twice after this Court had commented upon the significance of his prior testimony. As these Findings have reflected, various inferences arising from defendants' testimony have been drawn against them and in favor of Champion in several respects.

### Q. Irreparability of Harm to Champion and Its Shareholders

110. As the Conclusions will reflect, recognition of a private cause of action for Champion by reason of 1934 Act § 13(d) violations is predicated on its serving as surrogate for its shareholders (and not, of course, simply to protect its management against takeovers). These remaining Findings therefore focus on the irreparability of harm to Champion in that capacity and hence to its current shareholders—not to its former shareholders who sold during a period of inadequate disclosure (such persons are free to pursue a damages remedy, either individually or as a class).

111. Schwartz's testimony demonstrates that the effect of rumors and innuendo in a competitive business such as Champion's cannot be underestimated. Champion's competitors have already attempted to exploit defendants' avowed intent to spin off assets and sell the company. Champion's customers, lenders and suppliers feel less secure. Champion's reputation for reliability and quality—an important intangible asset—has been directly jeopardized (Schwartz Tr.).

112. At the October 1986 Automotive Warehouse Distributor Association convention in Las Vegas, Champion's representatives encountered expressions of concern from customers as to Champion's future. Customers and suppliers have continued to voice such concerns. At least one competitor has added assertions of Champion's possible liquidation to its efforts to win away Champion's customers (Schwartz Tr.).

113. Chrysler—Champion's customer with the greatest future potential—has graphically demonstrated its particular concern about Champion's ability to handle its replacement parts business for warranty and service purposes in light of the possible takeover (Schwartz Tr.; Savini Tr.). Whereas Chrysler had previously negotiated privately with Champion for service and supply contracts on numerous parts lines, it has now told Champion (at a meeting requested by Chrysler with Champion's top management) that, as a direct result of the possible change in control, it will put those contracts out for competitive bids to establish alternative sources of supply (Schwartz Tr.; Savini Tr.). Even if Champion retains that Chrysler business, the competitive bidding process is likely to lessen the financial value to Champion of any resulting Chrysler contracts (Schwartz Tr.).

114. Champion's employee relationships have been affected as well. After defendants' intentions gained public currency, Champion sustained a slowdown at its plant in Lock Haven, Pennsylvania—where many of Champion's employees have seen another major area employer go out of business due to a takeover. That slowdown was directly related to concern about the possible takeover, and it disrupted production for an entire week (Savini Tr.).

115. Because going out of business is of course a permissible business decision, any consequences that may flow from such a decision (or from the anticipation that such a decision may be made by a corporation) cannot be—as such—actionable irreparable injury. Hence the legitimate acquisition of control by persons having the intentions held from the outset by the Cormier-Navon-RRH group, and creating the consequences described in Findings 111–14, would not represent irreparable injury cognizable in equity. But here that group's conduct in failing to make proper disclosure during the period they were acquiring control has deprived Champion's present shareholders of the opportunity to make a full range of different decisions as to Champion's future course—and the accomplished fact of a shift of control renders that injury both irreparable and cognizable in equity.

116. Both for the reasons stated in Finding 115 and otherwise, defendants'

blocking position in Champion's shares causes substantial and irreparable adverse effects. Champion's shareholders now face an illiquid market for Champion's shares. Champion's ability to raise equity capital, or to find investment bankers willing to manage placements of its shares, has been substantially impaired (Schwartz Tr.; PX 65). Under Illinois law each major corporate transaction such as the sale of assets outside the ordinary course of business, a merger or consolidation with another corporation, amendments to the articles of incorporation (including the creation of new classes of stock and the authorizations of additional shares)[48] and dissolution requires approval by the holders of at least two-thirds of the outstanding shares (Ill. Rev.Stat. ch. 32, ¶¶ 10.20(c), 11.20(a), 11.60(c) and 12.15(c)). Without the consent of defendants and those acting in concert with them Champion cannot undertake any such transaction.[49]

### Conclusions of Law

1. This Court has jurisdiction of this action under 28 U.S.C. § 1331, because Champion asserts claims under 1934 Act § 13(d) (upheld in these Findings and Conclusions) and 1934 Act § 14(a) (rejected by these Findings and Conclusions). Champion has an implied private right of action under the first of those provisions of the 1934 Act, essentially as a surrogate for its shareholders. *Indiana National Corp. v. Rich,* 712 F.2d 1180, 1182–85 (7th Cir.1983); and see generally this Court's December 16, 1986 memorandum opinion and order in this case, 650 F.Supp. 87.

2. On Champion's current motion for preliminary injunctive relief, it has the burden of establishing each of what our Court

of Appeals has most recently described as "the five (sometimes grouped as four) elements plaintiff must establish to obtain a preliminary injunction" (*Faheem-El v. Klincar,* 814 F.2d 461, 466 (7th Cir.1987)). There have been varying articulations of those elements (most extensively discussed in *Roland Machinery Corp. v. Dresser Industries, Inc.,* 749 F.2d 380, 382–88 (7th Cir.1984)), but this Court has found it most convenient to use the summary listing in *Brunswick Corp. v. Jones,* 784 F.2d 271, 273–74 (7th Cir.1986) (citations omitted): [50]

(1) that it has no adequate remedy at law; (2) that it will suffer irreparable harm if the preliminary injunction is not issued; (3) that the irreparable harm it will suffer if the preliminary injunction is not granted is greater than the irreparable harm the defendant will suffer if the injunction is granted; (4) that it has a reasonable likelihood of prevailing on the merits; and (5) that the injunction will not harm the public interest.

3. Champion has no adequate remedy at law. Former Champion shareholders who sold on the basis of inadequate information have, of course, an adequate remedy in damages—either individually or on a class basis (see, e.g., *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 60, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975); *Gearhart Industries, Inc. v. Smith International, Inc.,* 741 F.2d 707, 716 (5th Cir.1984)). But the very cases that have confirmed a corporate cause of action for violation of 1934 Act § 13(d) have done so on bases that themselves show why damages will not suffice to compensate the corporation (or its existing shareholders for whose benefit it sues) for the injuries sustained (see, e.g., *Bath In-*

---

**48.** Champion's articles of incorporation authorize only the issuance of common shares.

**49.** After the Hearing (indeed, while these Findings and Conclusions were in the final stages of preparation), Champion entered into a major stock and stock warrant transaction with Echlin Inc., a transaction Champion then sought to introduce into this litigation by moving to amend its Complaint to seek declaratory relief upholding the transaction. This Court denied that motion, and Champion then filed a new lawsuit asking the same relief (that action was

assigned to this Court's colleague Judge William Hart). Nothing in that post-Hearing development vitiates the force of this Finding. Whether or not the Echlin transaction reflects a valid exercise on the part of Champion's Board (an issue to be decided by Judge Hart), the fact remains it necessarily represents one of the materially narrowed options available to Champion by reason of defendants' blocking position.

**50.** *Faheem-El,* at 466 also refers to *Brunswick* for that purpose.

*dustries, Inc. v. Blot,* 427 F.2d 97, 112–13 (7th Cir.1970); 650 F.Supp. at 89; cf. *Rondeau,* 422 U.S. at 57–65, 95 S.Ct. at 2075–79).

4. Champion will suffer irreparable harm absent preliminary injunctive relief. *Roland* was the first of our Court of Appeals' decisions to engage in a substantial exposition of the distinction between the "no adequate remedy at law" standard and this one.[51] In the *Roland* sense that the irreparable injury requirement means a plaintiff cannot wait until the end of trial to get effective relief (749 F.2d at 386), the kinds of factors already identified in Findings 111–16 satisfy that requirement.

5. Balancing of the relative harms also favors Champion. These Findings and Conclusions have already described the irreparable harm to Champion and its shareholders were this Court to deny injunctive relief. On the other side of the coin, it is necessary to consider the degree of harm to defendants were an injunction granted that ultimately proved improvident (*Roland,* 749 F.2d at 387). In that respect:

(a) Nothing in the injunction provided for here will deprive any defendant of profits derived from that defendant's purchases of Champion shares—unless, perhaps, it were to be proved such profits were obtained in violation of law. By definition, defendants cannot complain of any "harm" they would sustain in that respect.

(b) Only shares acquired after defendants' apparent 1934 Act § 13(d) violations will be neutralized by the preliminary injunction prescribed by this Court. Defendants will remain free to vote their previously-acquired shares as they choose, so they cannot complain of any harm as to those first-purchased shares.

(c) As to defendants' neutralized shares, if and to the extent any defendant desires in the future to obtain proxies for Champion Board representation or

for voting on any corporate plans, that defendant is free to do so. Any defendant's success in those efforts will depend on that defendant's ability to persuade fellow shareholders of the correctness of his, her or its position—and to the extent a defendant is persuasive in that respect, the resulting proportion of all neutralized shares will be voted in a fashion that mirrors that defendant's position. Under those circumstances, no defendant can complain of "harm" from that operation of corporate democracy in the purest sense.

(d) Given the foregoing limitations on the injunctive relief to be granted against defendants, this Court concludes that any potential deferral of defendants' implementation of their current plans for Champion—and that will be the effect of so neutralizing defendants' shares—will pose less harm to defendants if the preliminary injunction were proved to have been improperly granted than the harm Champion would sustain by reason of the improper denial of such injunctive relief.

6. Granting the preliminary injunction will not disserve the public interest. *Roland,* 749 F.2d at 388 explains that final consideration looks to the effect on parties other than the litigants—to "consequences beyond the immediate parties." Here the principal third parties in interest are Champion's shareholders other than defendants. Because these Findings and Conclusions have consistently treated Champion's right to relief in terms of its obligation to represent the interests of its shareholders, the same already-identified factors that point to the granting of injunctive relief also serve to negate any resulting harm to the public interest.

7. All remaining Conclusions deal with Champion's reasonable likelihood of success on the merits, the remaining sine qua non for preliminary injunctive relief: [52]

---

**51.** In fact some decisions both before and after *Roland* have spoken of the two factors in the disjunctive rather than the conjunctive. As Judge Posner's *Roland* discussion reflects (749 F.2d at 386), it makes little sense to speak of a plaintiff having to show *either* but not *both* of

those two things, but the two may well merge under some circumstances (as where the only remedy sought at trial is damages).

**52.** Even though a plaintiff must establish each of the factors referred to in these Conclusions to justify preliminary injunctive relief, in many

(a) the likelihood of success in proving the Cormier-Navon-RRH Defendants were a statutory "group" at a time earlier than the first Section 13(d) filing by any of them, so their earlier nonfiling violated 1934 Act § 13(d);

(b) the likelihood of success in proving the Cormier-Navon-RRH Defendants failed to disclose material facts as to their respective intentions and plans for Champion, again violating 1934 Act § 13(d);

(c) the likelihood of success in proving Hodes and Gray failed to disclose material facts as to their (or Gray's) intentions and plans for Champion, also violating 1934 Act § 13(d); and

(d) the likelihood of success in proving any defendants conducted illegal proxy solicitations, thus violating 1934 Act § 14(a).

8. On the issue of "group" formation before the first Cormier Schedule 13D was filed, whenever (as is most often the case, and as is true here) concealment is at issue, plaintiff's proof necessarily has to be circumstantial (see, e.g., *Bath Industries*, 427 F.2d at 110–11; *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir.1982); *Clarostat Mfg. Co. v. Ostrau*, [1982–83] Fed.Sec.L. Rep. (CCH) ¶ 99,205, at 95,827 (D.N.H. 1983)). This Court is not compelled to play ostrich in the face of the strong circumstantial evidence demonstrating the existence of an agreement among Cormier Defendants, Navon Defendants and RRH from the inception of their Champion stock purchases; see *Citizens First Bancorp, Inc. v. Harreld*, 559 F.Supp. 867, 872 (W.D. Ky.1982):

> It would require a degree of naivete unbecoming to this Court to believe that the various activities of defendants were not the product of an agreement among the group but, rather, were merely coincidences.

That evidence includes all the matters identified in the Findings indicating:

(a) a common plan and goal (see, e.g., *Bath Industries*, 427 F.2d at 111; *Financial General Bankshares, Inc. v. Lance*, [1978] Fed.Sec.L.Rep. (CCH) ¶ 96,403, at 93,425 (D.D.C.1978));

(b) a pattern of parallel and continued purchases over a relatively short and essentially concurrent time period (see, e.g., *General Aircraft Corp. v. Lampert*, 556 F.2d 90, 95 (1st Cir.1977); *Financial Bankshares*, ¶ 96,403, at 93,425; *Twin Fair, Inc. v. Reger*, 394 F.Supp. 156, 160 (W.D.N.Y.1975); contrast *K–N Energy, Inc. v. Gulf Interstate Co.*, 607 F.Supp. 756, 766 (D.Colo.1983));

(c) correlation of defendants' activities and intercommunications, largely through the Oppenheimer people acting as their common agent (see, e.g., *Seilon, Inc. v. Lamb*, [1983–84] Fed.Sec.L.Rep. (CCH) ¶ 99,448, at 96,552, (N.D.Ohio 1983); *Jewelcor Inc. v. Pearlman*, 397 F.Supp. 221, 251 (S.D.N.Y.1975); *General Aircraft*, 556 F.2d at 95);

(d) Cormier's and O'Neil's claims of shareholder support at the October 23 meeting with Champion (see, e.g., *Wellman*, 682 F.2d at 363–64; *Seilon*, ¶ 99,-448, at 96,551)—claims this Court finds confirmatory not only of the then-present situation but of the long-existing existence of the Cormier-Navon-RRH "group" as well.

In all the circumstances, it is an understatement to say Champion has a reasonable likelihood of success on that issue.

9. On the issue of nondisclosure of material facts in the actually-filed Schedules 13D (an issue relevant to both the Cormier-Navon-RRH group and the Hodes-Gray group), the plans and intentions identified in the Findings were clearly material and

ways the merits inquiry may be viewed as most critical. For obvious reasons, some cases speak of addressing that issue first because a failure on that score is immediately fatal to plaintiff (see, e.g., *O'Connor v. Board of Education of School District No. 23*, 645 F.2d 578, 580 (7th Cir.1981)). This opinion reverses that approach only because the merits inquiry requires a bit

more discussion. One other point bears mention: *Roland*, 749 F.2d at 387–88 has identified the "sliding scale" approach that links, for analytical purposes, the likelihood-of-success and irreparable-injury requirements. In this case Champion clearly meets both requirements by a substantial margin, so sliding-scale concepts simply do not come into play.

were certainly required to be disclosed in the Schedules 13D, despite defendants' then-present inability to accomplish those plans (see, e.g., *Chromalloy American Corp. v. Sun Chemical Corp.*, 611 F.2d 240, 246–47 (8th Cir.1979); *Dan River, Inc. v. Unitex Ltd.*, 624 F.2d 1216, 1225–26 (4th Cir.1980), *cert. denied*, 449 U.S. 1101, 101 S.Ct. 896, 66 L.Ed.2d 827 (1981); *K–N Energy*, 607 F.Supp. at 768; *Spencer Cos. v. Agency Rent-a-Car, Inc.*, 542 F.Supp. 237, 248 (D.Mass.1982); *Kirsch Co. v. Bliss & Laughlin Industries, Inc.*, 495 F.Supp. 488, 500, 504 (W.D.Mich.1980)). Both sets of defendants' Schedules, by framing their statements in the vague and boilerplate way they were made, were doubly misleading in their omissions of highly material facts. Once again Champion has established far more than a reasonable likelihood of success on the issue.

10. Under the circumstances here, no reasonable likelihood of success on the 1934 Act § 14(a) claim has been shown. What was sought and obtained by Cormier as evidence of shareholder support after the October 23 meeting, with no shareholders' meeting in the offing, could not be characterized as "proxies." Indeed that evidence of support was intended to seek and obtain Champion Board representation *without* such a meeting. Whether or not such conduct may otherwise be actionable, 1934 Act § 14(a) is not implicated.

\* \* \*

All the prerequisites of preliminary injunctive relief have thus been met by Champion. What is and is not called for in the shape of such relief is this:

1. Until further order of this Court, in all circumstances requiring or permitting votes by Champion's shareholders, all "tainted" Champion shares owned by any of Cormier Defendants and Navon Defendants (shares they acquired after the end of June 1986, by which date the aggregate Cormier-Navon-RRH holdings had triggered the initial filing date in accordance with Finding 40) and by Hodes (shares he acquired after July 15, 1986, when he and Gray first topped the aggregate 5% level—see Finding 53) shall be voted only in proportion to the votes cast by shares that are not so "tainted." All shares owned by any person in active concert or participation with any one or more of Cormier Defendants, Navon Defendants and Hodes shall be voted only in the same manner.[53]

2. No bar is imposed on any further purchase of Champion shares, or on any proxy solicitation, by any defendant once the market has become fully informed of the material facts by defendants correcting their Schedules 13D to reflect these Findings and Conclusions and this Court's entry of a preliminary injunction. At that point defendants should be in no different position from anyone else in terms of dealing in Champion shares or of seeking support for their plans for Champion.

3. Upon submission of appropriate language, defendants will also be enjoined against any sales of their previously-acquired "tainted" shares in a manner that will disrupt the market or will create in their purchaser or purchasers the same potential for harm to Champion now represented by defendants' ownership of such "tainted" shares. Because defendants acquired their present "tainted" shares in violation of law, protecting Champion against the unrestricted transfer of a controlling or blocking interest

---

**53.** Apart from any question whether the so-called Cormier and Navon "puppies" were part of the Cormier-Navon-RRH "group" so as to trigger further Schedule 13D filings, the stock acquisitions by those persons were the direct result of the Cormier and Navon involvement in their own Champion stock purchases. Given the circumstances of acquisitions by the so-called "puppies" and the fact they acquired their shares while the market was deceived by the Cormier-Navon-RRH violations (facts also cou-pled with their allegiance to Cormier and Navon), it would subvert the purpose of preliminary injunctive relief (to deprive Cormier and Navon of the benefits of their own 1934 Act § 13(d) violations) if those shares were not neutralized as well. That same principle applies to all Oppenheimer-controlled shares acquired during the same post-violation period and to any other shares acquired during the same period by any other shareholders included in Cormier's claimed 42% "control" (see Finding 42).

in its shares is a necessary adjunct of this Court's preliminary injunction.

4. No decision is reached here as to the need for defendants to offer rescission to the former Champion shareholders whose shares were acquired by any defendant as "tainted" shares. That issue can await further submissions by the litigants, or further developments apart from this action. For example, if an independent and timely class action were to be filed against defendants on behalf of former Champion shareholders who had sold after defendants' claimed violations of 1934 Act § 13(d), this Court would be inclined to leave the question of rescission or damages to such an action.

Champion's counsel are directed to submit to opposing counsel and this Court on or before April 20, 1987 a proposed form of preliminary injunction order conforming to these Findings and Conclusions. On or before April 20, 1987 all counsel are also directed to file with this Court and serve upon other counsel their respective submissions as to the appropriate form and amount of security under Rule 65(c) and 65.1 (a subject not addressed by any of the litigants to this point). This Court will then advise counsel as to any further procedures required for entry of the preliminary injunction itself.

## PRELIMINARY INJUNCTION ORDER

This action came on to be heard upon the motion of Champion Parts Rebuilders, Inc. ("Champion") for the entry of a preliminary injunction pursuant to Fed.R.Civ.P. ("Rule") 65. All parties were represented by counsel, filed pleadings and participated actively in extensive (and accelerated) discovery.

This Court held an evidentiary hearing ("the Hearing") on Champion's motion December 29, 30 and 31, 1986 and January 2 and 5, 1987, in which it received exhibits and heard testimony and the arguments of counsel for Champion and all defendants. After the close of the evidence, all parties submitted Proposed Findings of Fact and Conclusions of Law for this Court's consideration.

On April 9, 1987 this Court issued a memorandum opinion and order (the "Opinion") containing Findings of Fact ("Findings") and Conclusions of Law ("Conclusions"), in which this Court determined Champion had met all the prerequisites under *Brunswick Corp. v. Jones*, 784 F.2d 271, 273–74 (7th Cir.1986), for the issuance of a preliminary injunction providing for the relief provided by this Order. After the Opinion was issued, defendant Scott Hodes ("Hodes") settled with Champion.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. As used in this Order:

(a) "Defendants" means all named defendants in this action except Rieger, Robinson, Harrington & Company, Inc. ("RRH"), which settled with Champion before the Hearing, and Hodes, who settled with Champion after issuance of the Opinion. Both RRH and Hodes have been dismissed from this action.

(b) "Cormier Defendants" means Cormier Corporation, Odilon A. Cormier, Claude A. Cormier, Monique T. Cormier, Daniel O. Cormier, Nicole M. Cormier, Pierre A. Cormier and Suzanne C. Arena.

(c) "Navon Defendants" means Herman Navon, Blanche Navon, Samuel E. Navon, Valerie D. Navon, Morris Navon, Renee Navon, Ruben S. Navon and Stephanie D. Navon.

(d) "Agents" of any Defendant means his, her or its officers, agents, servants, employees and attorneys.

(e) "Persons in Concert" with any Defendant means all persons in active concert or participation with such defendant or his, her or its Agents.

(f) Defendants, Agent and Persons in Concert include all persons owning, holding or having voting power over Tainted Shares.

(g) "Voting" means voting, exercising or executing shareholder consents, granting proxies or otherwise exercising any right of shareholder suffrage in all circumstances requiring or permitting the exercise of shareholder suffrage.

(h) "Tainted Shares" means all the following Champion shares:

(1) all shares (including all shares held in brokerage, agency, nominee and depository accounts) acquired by any of the Cormier Defendants and Navon Defendants and their respective Agents and Persons in Concert at any time between July 5, 1986 [1] and ten days after the Cormier and Navon Defendants hereafter file complete and accurate Schedules 13D; and

(2) all other shares purchased or acquired at any time between July 5, 1986 and ten days after the Cormier-Navon Defendants hereafter file complete and accurate Schedules 13D, that:

(a) were purchased or acquired by any of the persons and entities listed on Exhibits A and B; or

(b) are held in brokerage, agency, nominee or depository accounts, or are controlled by stockbrokers, agents, nominees or depositories (including but not limited to Oppenheimer & Co., Inc.), and are beneficially owned by any of the persons and entities listed on Exhibits A and B; or

(c) were purchased or acquired by other persons and entities based upon, or after, direct or indirect recommendation, solicitation or communication about Champion from any of the Defendants, Agents or Persons in Concert; or

(d) were included in Odilon Cormier's claimed 42% control of Champion announced on October 23, 1986.

Tainted Shares shall continue in their status as Tainted Shares until they are sold or transferred in accordance with, and subject to the restrictions imposed by, Paragraph 4.

(i) "Untainted Shares" means all outstanding Champion shares other than Tainted Shares.

(j) "Paragraph—" means a numbered paragraph of this Order and "Exhibit—" means an Exhibit to this Order.

2. Until further order of this Court, in all circumstances requiring or permitting votes by Champion shareholders:

(a) All Tainted Shares owned or controlled by Defendants, Agents and Persons in Concert shall be voted only in proportion to the votes cast by all Untainted Shares.

(b) All Tainted Shares must be voted and cannot abstain.

(c) Tainted Shares may not be used for the purpose of calling a special shareholders' meeting.

To facilitate the implementation of this Paragraph 2, sole voting power (as opposed to investment power) of Tainted Shares is irrevocably vested in the Secretary of Champion until such shares have been sold in compliance with Paragraph 4. Champion's Secretary shall vote all Tainted Shares in accordance with this Order. All brokers, agents, nominees, depositories and persons who presently own or control the voting power of Tainted Shares shall neither vote Tainted Shares nor give, accept or request any instructions for the voting of Tainted Shares. All persons who presently own or control the voting power of Tainted Shares shall promptly advise their brokers, agents, nominees and depositories of the requirements of this Order.

3. Until 28 days after Defendants have hereafter filed complete and accurate Schedules 13D reflecting this Court's Findings and Conclusions, the entry of this Order and all other material facts (a condition that has not been satisfied by the Cormier-Navon Defendants' filing of an April 20, 1987 Schedule 13D amendment and will not be satisfied by a further amendment that simply attaches a copy of this Order), Defendants, Agents and Persons in Concert are enjoined and restrained from purchasing additional Champion shares and from soliciting proxies for Champion shares.

4. Until further order of this Court, Defendants, Agents and Persons in Concert are hereby enjoined and restrained from

---

1. This was the required filing date of a complete and accurate Schedule 13D after the Cormier-Navon-RRH Defendants first formed a Section 13(d) group owning more than 5% of Champion's shares (an event that took place June 24, 1986).

making any sale or other transfer of Tainted Shares:

(a) to any person, entity or group who or that owns, holds or controls, or would as a result of the sale or transfer own, hold or control, more than 5% of Champion's outstanding shares, except that:

(1) Tainted Shares may be sold or transferred to any other Defendant, Agent or Person in Concert (who shall thereupon continue to hold such shares as Tainted Shares subject to all the terms and conditions of this Order); and

(2) Tainted Shares may be tendered in response to any cash tender offer for 100% of Champion's stock by a person not affiliated (in the sense employed in SEC regulations) with any of Defendants, Agents or Persons in Concert, which tender offer contains a non-waivable condition that no shares will be accepted unless a majority of the Untainted Shares are tendered and accepted; or

(b) in any privately negotiated or open market sale or other transfer (not permitted under Paragraph 4(a)) that would disrupt the market for Champion shares; but in no event shall:

(1) sales or transfers by the group comprising the Cormier-Navon Defendants exceed the volume limitations specified in SEC Rule 144(e)(1) promulgated under the Securities Act of 1933;

(2) sales or transfers by any other "person" as defined in SEC Rule 144(a)(2) exceed the volume limitations specified in SEC Rule 144(e)(1); or

(3) sales or transfers by the group comprising the Cormier-Navon Defendants, or by any other "person" as defined in SEC Rule 144(a)(2), exceed 1,000 shares per day if the arithmetical average of the closing price for the 10 preceding trading days is less than 80 percent of the arithmetical average of the closing price for the preceding 30 days.

Every sale or transfer of shares by any person who owns, holds, or controls both Tainted and Untainted Shares shall be deemed a sale or transfer of Tainted Shares.[2] Any shares purchased by any Defendant, Agent or Person in Concert within 30 days of any sale or transfer by any Defendant, Agent or Person in Concert shall be deemed to be Tainted and Untainted Shares in the same proportion as the shares sold or transferred.

5. In accordance with Rule 65(c), Champion is ordered to post a bond, with surety, in the face amount of $25,000. That amount is ample, in light of the Findings and Conclusions, to comply with the purposes stated in Rule 65(c).[3]

6. This Order has been issued in accordance with Rule 65(b) and 65(d), based upon and for the reasons stated in the Findings and Conclusions and summarized as follows:

(a) Champion has more than met its burden of demonstrating a reasonable likelihood of success on the merits, specifically:

(1) Cormier-Navon Defendants and RRH formed an undisclosed Section 13(d) group that by the end of June 1986 (more precisely by June 24, 1986)

---

**2.** This provision and the provision in the following sentence are intended to assure two results:

(a) To the extent any sale or transfer would not violate the provisions of Paragraph 4(a) or 4(b), treating the sold or transferred shares as previously Tainted Shares will reduce the number of shares remaining subject to the restrictions of this Order, thus accelerating the time when such restrictions would lapse.
(b) To the extent any sale or transfer would violate the provisions of Paragraph 4(a) or 4(b), treating the sold or transferred shares as previously Tainted Shares will prevent the evasion or avoidance of this Order that could

result from labeling such sold or transferred shares as Untainted.
Cf. *First Wisconsin Financial Corp. v. Yamaguchi,* 812 F.2d 370, 374–76 (7th Cir.1987).

**3.** This Court has considered and rejected the suggestions by Cormier-Navon Defendants calling for a much larger bond. Those suggestions grossly exaggerate the potential harms that would be sustained if any party were "found to have been wrongfully enjoined or restrained" by this Order. Any such potential harms have been even further lessened by the changes this Order has made from the form of draft order initially proposed by Champion.

had acquired more than 5% of Champion's shares without proper disclosure.

(2) Cormier-Navon Defendants and RRH failed to disclose other material facts concerning their plans and purposes, in further violation of Section 13(d).

(b) Champion has no adequate remedy at law.

(c) Champion will suffer irreparable harm absent preliminary injunctive relief.

(d) Defendants will not be deprived by this Order of any lawful profits or other lawful benefits derived from their purchases of Champion stock. Any potential harm to Defendants if this Order should ultimately prove to have been issued improvidently is far less than the harm that would result to Champion from denying the preliminary injunction contained in this Order.

(e) Granting this preliminary injunction will not disserve the public interest.

## EXHIBIT A

Frank Ales

Sal Ales

David Assouline

Bella Bernstein

Alan Celestino

David & Alice Clark

Katrina Clark

Kelley Clark

Kimberly Clark

Kori Clark

Irving Diller

Richard Diller

Andrew Eastman

Pauline Eastman

Jerry Faneuil

Charles Fiscella

Jane Fisher

Florabelle Flowers Co. Pension

Carl Greenberg

David Greenberg

Steven Haas

Marvin Harrison

Thomas & Linde Healey

Herbert Hoffman

Estate of John Kelley

Jack Kelley

Lisa Lavine

Sam Lavine

Jerry Librette

Al Londino

Guy Magro

Tony Magro

Martin Marto

Tim Miller Sales Company

Roland J. Nadeau

John O'Day

Carmine Paulo

John Perley

Ernest & Irene Poire

Jerry Pollack

Phil Pollack

Andrew Rhoades

C. Malcolm Rhoades

Larry Rosenblum Pension

Michael Rosenblum

Tom Savino

Larry Schur

Paul Schur

James Silva

Mark Vaughn

John Vincenzo

Carole & William Wallace

Paul Wynn

Tom Wynn

Robert Yahn

(Source: Plaintiff's Exhibits 23 and 24)

## EXHIBIT B

Thom. Arbogast

T. Barnes

Norman C. Barnhart

Bartizan Corporation

Bartizan Def. Ben.

L. Borsan

Arthur Brill

F. Brown

P & S Clancy

Richard Clay

Datacomm P/S

Dels Consulting

Dels Consulting Pension

John Demmler

Paul Dewey

Barbara A. Doolittle

Joseph Drinon

Leon P. Dusoe

Wm. and M. Eakin

William Einstein

Ellenberger JT

Ellis Fund

Equitable Bank-NA

Exec. Life CA

Exec. Life NY

First Safety Fund

David and Linda Foster

Friedman JT

Robert Friedman

Chris Gallagher

Mike and Jeanne Gatsas

G.A. Kraut Co.

Generation Capital

W. Whitney George

Alex George

Meredith George

Mary George

Joseph A. Giovino

Herb Graves

Haas

R & K Hawryluk

Lewis C. Hoff

Hoffman Elec.

H. John Hoffman

Donald and Billie Jenkins

Steven Kalin

Felix Kalin

Keltron Health Corp.

Brian W. King

Nicole King

Robert J. Kramer

Kraut

F & J Leckey

W & B Lekse

T. Downs Mallory

Warren and Jane McConathy

Doug McKay

Michael Metz, individually and as partner of any partnership including Oppenheimer Asset Transfer Partners L.P.

Ira B. Miller

Arivah Newman

Nevin JT

Becky O'Connor

R. O'Connor

Daniel J. O'Neil

Frederick W. Okie, Jr.

Oppenheimer Asset Transfer Partners L.P.

Gerald Ostrow

First National Bank of Peterborough

Phoenix Assoc. II (or # 2)

Pittsburgh Nat'l.

Reed, Luce, Good, et al.

O & E Reese

Regis Ins.

D. Reimer Def. Benefit

George Robinson JT

Steve Rosenthal

David Rosin

Peter A. Russ

Sakom Enterprises, Inc.

Samples

I. Stephen Samuels

Harish Sanjanwala

William H. Sawyer

Smith JT

Helen C. Smith

Kermit Steinbeck

R.R. Steinbeck

Margaret L. Steinbeck

Andrew L. Stern

Edgar and Gayle Stinson

Est. R. Sweet

Brad Thomas

P. Brooks Thompson

Paul B. Thompson

Peter Thompson

Errol Train

Vincel Valve

Vincel JT

Peter Warburton

Norman Weinger, individually and as partner of any partnership including Oppenheimer Asset Transfer Partners L.P.

Allen Weinstein

Charles F. Werninger

Whitman JT

Ralph R. Whitney, Jr.

Raymond Wieczorek

Wilbur

Paul and Jane Worsowicz

S. Zimmerman P.C.

(Source: Plaintiff's Exhibits 15, 16, 26; W. Whitney George cross-posting sheets; Joseph Drinon cross-posting sheets)